**ESCO CORPORATION, Appellant,**

**v.**

**UNITED STATES of America.**
**Appellee.**

**No. 19384.**

United States Court of Appeals
Ninth Circuit.

Jan. 20, 1965.

Guy J. Rappleyea, Black & Apicella, Portland, Or., L. M. McBride, McBride, Baker, Wienke & Schlosser, Chicago, Ill., for appellant.

Wm. H. Orrick, Jr., Asst. Atty. Gen., Lionel Kestenbaum, Donald L. Hardison, Dept. of Justice, Washington, D. C., Lyle L. Jones, Atty. Dept. of Justice, San Francisco, Cal., for appellee.

Before POPE, BARNES and JERTBERG, Circuit Judges.

BARNES, Circuit Judge:

This is an appeal from a jury verdict convicting appellant corporation of violating Section 1 of the Sherman Act (15 U.S.C. § 1) by means of its participation in an alleged price-fixing conspiracy, admittedly a *per se* violation of the Act. United States v. Trenton Potteries Co.,[1] 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1927); Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911).

The defendants originally named as co-conspirators were the four principal West Coast distributors of stainless steel pipe and tubing. The conspiracy was alleged to have been a continuing one, beginning prior to the year 1960, and continuing "until at least May 1961." These four distributors were the Tubesales Corporation (herein "Tubesales"); the Esco Corporation ("Esco"); Alaskan Copper Companies, Inc. ("Alaskan"); and the Republic Supply Company of California, doing business through its Kilsby Tube Supply Division ("Kilsby").

Jurisdiction existed below (15 U.S.C. § 4), and exists in this court (28 U.S.C. § 1291).

All-defendants other than Esco entered nolo contendere pleas prior to trial, so that Esco alone stood trial, No individual defendants were named or prosecuted. Several corporations, firms and individuals were alleged to be coconspirators but were not named as defendants.

The "central criminal design" charged herein was the fixing of prices in stainless steel pipe and tubing by nonproducing wholesale distributors within a described market area. That market area comprised the states of Washington, Oregon, California, Idaho and Utah.

### I—The Business Setting.

For several years prior to 1959 a relatively stable and uniform pricing structure in the distribution of stainless steel pipe and tubing existed on the West Coast. The dominant and largest distributor, "Tubesales," adopted the price at a figure called "mill parity," which was a delivered price, uniform throughout the market area, made up of an identical freight rate plus mill prices, less (a) quantity discounts, and (b) distributors' quantity discounts. These were known as a "functional discount" and a "functional resale discount," given by a seller to a buyer purchasing stainless steel pipe and tubing for resale to others.

F.O.B. prices were set and published by the mills; the delivered prices were set and published by the "Tubesales" price book.

Beginning in 1959, some Eastern mills and Eastern "stocking distributors" cut prices—in some instances by absorbing freight charges to the West Coast.

We quote from the government's brief:

"[T]he price-cutting eventually spread to some of the defendants themselves as well as to smaller nonstocking jobbers in the area who were able to undersell the defendants by reason of the traditional 10 percent discount extended them by the larger wholesale distributors. To meet these competitive threats * * * Tubesales, the price leader and dominant distributor in the area, launched a program to encourage price stability by bringing price deviators back in line with the Tubesales published price list (see Tr. 92–98 * * *) * * *. [T]he old, and higher, published prices [were] maintained even in the face of 'tremendous' price cuts by the eastern producing mills (Tr. 700). These prices were, in fact, adhered to for several months until the downward pressure of prices became so great that Tubesales and Esco * * * almost simultaneously published new price lists * * * [around November 1, 1960] (Tr. 749–50, 137). The new prices were virtually identical (Tr. 749–50).

"(2) To meet the threat posed by competition from the smaller, nonstocking jobbers, the defendants [including Esco], at a series of meetings held in Los Angeles and San Francisco at the invitation of Tubesales, agreed to reduce the discount to these distributors from the historic 10 percent to 5 percent. It was felt that such a reduction would substantially eliminate troublesome price-cutting and underselling by this class of distributors (see Tr. 120 [-121]) and yet allow them 'to continue in business, and at least make a small profit' (Tr. 618).

"(3) Similarly, with respect to the Idaho-Utah area, prices had become 'highly competitive' (Tr. 343) because a number of the defendants, including Esco and Alaskan (Tr. 558), had been quoting below the published Tubesales prices and, in fact, even Tubesales' representative in Salt Lake City had been selling below list (Tr. 452). The problem in this area revolved around the freight factor built into Tubesales' price book. The published prices in Tubesales' so-called western price book, which was applicable throughout the six-state market area, made no allowance for the cheaper freight rate available from eastern producing points to delivery sites in Idaho and Utah. For example, the pub-

lished price for a given item was as great in Salt Lake City as in Los Angeles notwithstanding the difference in freight from the eastern mills to the two points (Tr. 454; GX 63). As a result, many distributors were either deducting the freight differential from published prices in the Salt Lake City area or, as in the case of Tubular Service, a non-defendant co-conspirator, absorbing the freight charge altogether (Tr. 577, 579). To correct this situation, Tubesales invited representatives of Esco, Alaskan and others (Tr. 206, 556) to a meeting at Salt Lake City on January 17, 1961, where an agreement was reached that a new and reduced freight factor would thenceforth be used in quoting prices in the Idaho-Utah area (Tr. '343–349, 350–51, 356–57, 524–31). New price lists embracing the lower freight rate were drawn up by Tubesales, hand-delivered to Esco (Tr. 506; see also Tr. 544–46) and made effective immediately (Tr. 609–10; GX 87, 93)." [1]

### II—Specifications of Error.

Appellant's principal point urged on this appeal is the alleged insufficiency of the evidence to support the verdict. (Specifications 1 and 2.)

Appellant also raises two specifications with respect to the admission of evidence (3 and 4); alleged prejudicial remarks of the trial judge (Specification 5); and Specification 6, the prejudicial instruction to the jury by the trial judge withdrawing the third subspecification of the alleged conspiracy. (Section V of the

---

[1]. We must concede several of these facts are in dispute. For example, consider the last line in the quotation. At oral argument, counsel for the government restated the fact that the new price lists distributed after the Salt Lake City meeting, embracing lower freight rates were "hand-delivered" by Mr. Tagmyer (sales manager of Tubesales stationed in Los Angeles) to Mr. Ted Smith (of Esco) in San Francisco. Counsel for appellant denied this fact, because it was disputed by other testimony. It was so disputed. But a fair reading of the testimony of Tagmyer (Tr. p. 506) permitted such an inference of a fact. The government's reference to pages 544 to 546 of the Transcript (the testimony of Hazen, Esco's Portland manager) does *not* support the stated fact. But the government might well, and better, have cited Ted Smith's own testimony (Tr. pp. 743–44) which does support it.

Appellant attacks the references in the government's brief to the record citations made in support of its factual statement—in fact makes reference to eighteen of such citations. (App. Reply Brief.) Some objections are mere semantic quibbles (Nos. 1, 8, 9, 11, 12, 13). Some correctly charge the government with being too inclusive in its reference to "defendant's acts," and in other language (Nos. 1, 4, 7, 17). Certain government references are inaccurate (part of Nos. 5, 6, 14; part of 15, 18), but certain facts are clearly established by other evidence (Nos. 6, 14). Thus, in many instances the appellant's objection is well taken. For that reason, we have carefully checked the record in our own references, but not in quotations from any briefs. The citations given may support, for example, a portion of the statement made in the government's brief, but not the entire statement. (Nos. 2, 3, 15, 16.)

As a striking example of the weakness of appellant's criticism of statements contained in the government's brief, we refer to item 10 (Reply Brief, p. A6):

"The Government's Brief said: 'Alaskan's price-cutting proclivities in turn precipitated deviations by other distributors, including Esco, especially in the Utah-Idaho, or the so-called Arco Area.' (Tr. p. 492; GX 54.)"

Appellant's reply brief charged the government with "taking liberties with the record" (p. 5), because

"The citation to the record is devoted solely to the identification of GX 54 *and nothing more.*" (Reply Brief, pp. A6–A7.) (Emphasis appellant's.)

Appellant's statement is 100% correct. But it overlooks the fact that the *contents* of GX 54 precisely support the statement contained in the government brief, as above quoted. (Ex. GX 54, dated January 1, 1961, lists 27 examples of bids made below the "protected" price of which 12 were Alaskan bids, 4 were Esco bids, 4 were Tubular Service bids, and the balance unattributed to any distributor or to some non-defendant.)

indictment, paragraph 9(c).)[2] In our opinion, Specifications 5 and 6 must be touched upon before we reach the question of alleged insufficiency in the evidence.

Specification of Error 6 is treated by appellant in its brief under organizational point IV A (d). The appellant correctly states: "The Court and the Government found themselves with possible proof of a cutting-charge conspiracy, but with no proof of an Esco connection."

The trial judge thereupon strongly indicated to government counsel that the charge contained in subsection (c) of paragraph 9, part V of the indictment, should be withdrawn.[3] It was.[4]

This action, says appellant, was prejudicial error, not because the evidence was stricken, but because it was admitted into evidence in the first place—without first establishing "a prima facie connection * * * between Esco and that act." That connection, of course, if Esco never participated actively in fixing and adopting identical cutting charges, could only be established by proof of Esco's participation in an overall conspiracy involving more than the cutting charge allegation.

Beyond noting that (a) the government frequently charges more than it can prove, and (b) no objection was made by defendant Esco, either during argu-

---

2. "(c) To fix and adopt identical charges for cutting stainless steel pipe and tubing into specified lengths; * * *."

3. "THE COURT: [Addressing itself to Government counsel] Why should I tell the Jury to find that they [Esco] were guilty on a specification which is not supported by the record? For instance, suppose you get a verdict, and on a motion for a new trial it develops that on one of these four there was not sufficient evidence to support the verdict. I would have to set aside the verdict, wouldn't I, because it is conceivable that the Jury would find the defendant guilty on a specification which was not proved and find the defendant innocent on all the other three.

 * * * * *

 "THE COURT: You [the Government] have been here for quite a while. I would not want to see you get a verdict and not be able to hold it.

 * * * * *

 "MR. BANKS: I was wondering if Mr. McBride—assuming I decide to withdraw the cutting charge then, as an example, would Mr. McBride stipulate to that?

 * * * * *

 "THE COURT: He does not have to stipulate to that. He has nothing to say about it.

 * * * * *

 "THE COURT: I am going to rely on you, but Mr. McBride is not going to say anything because he is not trying to correct your record. He is just trying to see how much error he can get into the record.

 * * * * *

"THE COURT: Mr. McBride won't have a thing to say. If you ask for a withdrawal of any of these specifications, I will grant it. * * *" (Tr. pp. 839–841.)

4. Taking the court's suggestion, the government in its summation to the jury withdrew specification (c) above (Tr. pp. 874–875):

 "First, they [Esco] denied that they conspired to fix and adopt identical cutting charges. *Now, * * * while I feel that the evidence shows that certain named defendants in the indictment did so conspire, I do not believe that our evidence shows beyond a reasonable doubt that Esco was a party to the conspiracy with respect to cutting charges * * *.*" (Emphasis added.)

 The court's treatment of the problem in its instructions to the jury was as follows (Tr. p. 947):

 "You will notice that I deleted one of the specifications in the indictment [after reading specifications (a), (b) and (d)], which read: 'To fix and adopt identical charges for cutting stainless steel pipe and tubing into specified lengths.' I did this because counsel voluntarily withdrew that specification and also because I concluded that there was insufficient evidence on this point to go to the jury.

 "Now the mere fact that I am leaving in the other three specifications does not mean that I am of the opinion that defendant is guilty of the other three specifications because on that issue I am expressing no opinion one way or the other."

ment (Tr. 874–75) or during instruction (Tr. 947), to the withdrawal of such issue from the jury, we will consider the "no connection" argument under our subsequent consideration of the insufficiency of the evidence (Specifications of Error 1 and 2).

### III—Conduct of Judge.

We turn to the error alleged in Specification 5, that "the District Court erred in making statements in the presence of the jury that the government witnesses were favorably disposed toward the industry of which Esco is a member, thereby misconstruing the demeanor of those witnesses and substantially prejudicing Esco defense."

■ Appellant seeks to buttress this argument (a) by remarks made by the court, *out of the presence of the jury,* (and at the argument for judgment of acquittal, for a new trial, and at time of sentencing) and (b) by citing one case. A reading of the transcript clearly indicates that the trial court correctly concluded that the witnesses Deshon, Kilsby, Walton, Bialock and Smith of Alaskan, et al., were in truth not favorable to the party calling them (the government), and hence could properly be considered hostile witnesses. As such they were properly and lawfully subjected to leading questions. Moreover, even had these witnesses not been considered "hostile," some "leading" would still have been proper, subject always to the judicial discretion of the trial judge.[4a]

■ In fixing the penalties after the three nolo contendere pleas were entered six months before the trial, the trial judge was required to learn something of the conspiracy. At that time he had also approved, signed and entered a consent decree in Civil Action No. 62–512 (of which appellant asks this court to take judicial notice, which we do) restricting Kilsby's future conduct in pricing stainless steel pipe and tubing. While a consent decree, forged by agreement between private and government attorneys, may not be a product of the trial judge's own effort, it must be scrutinized carefully and approved, both as to form and content, by the court entering it, prior to such entry. We cannot assume the experienced and capable trial judge failed to perform his duty, and merely rubber-stamped the consent decree. This is particularly unlikely in view of what he did in sentencing the three coconspirators, and more particularly, in view of the knowledge of the civil and criminal litigation which he displayed by his comments during the trial.

■ We find no merit to appellant's Specification of Error 5 that the trial judge incorrectly characterized the coconspirators' officers and agents as witnesses hostile to the government. They were, some in a guarded way, and others not so guarded.

### IV—Sufficiency of the Evidence.

We next consider the sufficiency of the evidence to support the conviction.

Appellant Esco's defense is that it was "only involved in the last two" of ten alleged "conspiratorial situations"; *(i. e.,* meetings between one or more of the representatives of the alleged conspirators) namely, two Jonathan Club meetings in Los Angeles (in June and July 1960) where discounts to nonstocking jobbers were discussed and the Salt Lake City meeting (in January 1961), where a number of matters were discussed.

"Esco," says its attorney, "had no relation whatsoever to the first eight 'situations', and its 'relationship' to the remaining two has been clearly set forth" in its brief (p. 78).

■ We do not consider it as clear as counsel would have us believe that Esco's involvement was "obviously lawful." It was lawful, it is said, because "where several acts or transactions are alleged to constitute a single general con-

---

4a. Northern Pacific Railroad v. Urlin, 158 U.S. 271, 273, 15 S.Ct. 840, 39 L.Ed. 977 (1894); Mitchell v. United States, 213 F. 2d 951, 956 (9th Cir. 1954).

spiracy, there must be proof of a common purpose of *all* defendants connecting *all* the acts or transactions," citing Nye & Nissen v. United States, 168 F.2d 846 (9th Cir. 1948), aff'd 336 U.S. 613, 69 S.Ct. 766, 93 L.Ed. 919 (1949). And "separate agreements \* \* \* do not establish a single conspiracy, unless \* \* \* connected together \* \* \* to show a central criminal design." Daily v. United States, 282 F.2d 818 (9th Cir. 1960). We agree completely. But this does not mean that *each* defendant or *all* defendants must have participated in each act or transaction; nor is proof required "that each accused knew the identity and function of all his alleged co-conspirators or that all worked together consciously to achieve a desired end." Marino v. United States, 91 F.2d 691 (9th Cir. 1937); Daily v. United States, supra at 820. Nor does it mean that a single defendant can join a continuing conspiracy long after others have commenced it, or partially carried it out, and thereby claim immunity either for his actions, or for those of others taking place before or after his active participation, Lile v. United States, 264 F.2d 278 (9th Cir. 1958); United States v. Kessler, 253 F.2d 290 (2d Cir. 1958); Phelps v. United States, 160 F.2d 858, rehearing denied sub nom. Peters v. United States, 161 F.2d 940 (8th Cir. 1947), cert. denied 334 U.S. 860, 68 S.Ct. 1525, 92 L.Ed. 1780 (1948), as long as he remains an active participant.

The "central criminal design" charged herein was the restraint of trade by fixing prices on stainless steel pipe and tubing within the described market area. But, it is contended, Esco's "relationship" to the two Jonathan Club meetings and the Salt Lake City meeting of the competitors was "perfectly legal \* \* \* there having been no proof by either direct or circumstantial evidence that Esco agreed or connected itself to any illegal act." (Appellant's Brief, p. 79.)

This conclusion is arrived at by appellant reciting: (a) the differing testimony as to which, and how many, of the competitors were present; (b) that although three subjects necessary to a price-fixing conspiracy were discussed— (i) a definition of a stocking-jobber; (ii) the preparation of lists of stocking and non-stocking jobbers', and (iii) the discounts to be allowed to each—all of this is irrelevant because "the record is utterly lacking in evidence of agreement as to any of these three substantive areas." (Appellant's Brief, p. 60.)

Of course, it is *admitted* (Appellant's Brief, p. 60) (1) that there was testimony by one witness that an *attempt* was made at a definition of a stocking jobber; (2) that three witnesses present had *prepared* lists of "stocking jobbers," but did not present them to the meeting; that Esco's representative Blake *had been given a list*, "he thought" by a competitor; that Blake had a list at the meeting and made notes thereon but did not recall if the notes were made at the meeting or later in his office; that Deshon, "the policeman," had seen no lists; that one witness "thought" some of those present had lists, but they were never displayed; one witness present said no *attempt* had been made to prepare such a list; two thought such an attempt had been made, but "abandoned"; (3) that there had been a proposal to reduce the discount from ten per cent to five per cent, but no "agreement" to do so.

From all this, says appellant's counsel, "there is a compelled inference" that Tubesales, the biggest competitor (who had pleaded nolo contendere to the charge of conspiracy) called the meeting "not to ask for agreement, but simply to announce" its own pricing plans. Were we triers of fact, we might well ask if this were so, what purpose was to be served by a meeting of competitors?

Nor are we so naive as to believe that a formal signed-and-sealed contract or written resolution would conceivably be adopted at a meeting of price-fixing conspirators in this day and age. In fact, the typical price-fixing agreement is usually accomplished in a contrary manner.

■ While particularly true of price-fixing conspiracies, it is well recognized law that any conspiracy can ordinarily only be proved by inferences drawn from relevant and competent circumstantial evidence, including the conduct of the defendants charged. Daily v. United States, 282 F.2d 818, 820 (9th Cir. 1960). A knowing wink can mean more than words. Let us suppose five competitors meet on several occasions, discuss their problems, and one finally states— "I won't fix prices with any of you, but here is what I am going to do—put the price of my gidget at X dollars; now you all do what you want." He then leaves the meeting. Competitor number two says—"I don't care whether number one does what he says he's going to do or not; nor do I care what the rest of you do, but I am going to price my gidget at X dollars." Number three makes a similar statement—"My price is X dollars." Number four says not one word. All leave and fix "their" prices at "X" dollars.

We do not say the foregoing illustration *compels* an inference in this case that the competitors' conduct constituted a price-fixing conspiracy, *including an agreement to so conspire,* but neither can we say, as a matter of law, that an inference of no agreement is compelled. As in so many other instances, it remains a question for the trier of fact to consider and determine what inference appeals to it (the jury) as most logical and persuasive, after it has heard all the evidence as to what these competitors had done before such meeting, and what actions they took thereafter, or what actions they did not take.

Much of appellant's argument (pp. 57 to 76) is more appropriately made to the jury than to an appellate court.[5]

Appellant likewise devotes three pages to the law applicable to the facts, and their insufficiency to establish liability. Much, in fact most, of the law cited is good law. As an example, appellant begins with the proposition (Appellant's Brief, p. 76) that price-fixing is a *per se* violation of Section 1 of the Sherman Act. We agree. "But Section 1 does not proscribe price uniformity." We agree.

■ An accidental or incidental price uniformity, or even "pure" conscious parallelism of prices is, standing alone, not unlawful. Nor is an individual competitor's sole decision to follow a price leadership, standing alone, a violation of law. But we do not find that factual situation here.

"The crucial question," urges appellant, "is whether or not the evidence proves the existence of a 'contract, combination, or conspiracy.'" We agree. And we agree that decisional law, not the statute, makes it clear there must be *an element of agreement*—that an agreement is the gist of the offense of price-fixing.

■ We agree with appellant's contention that although "a written or otherwise express agreement is not required to support a finding of a Section 1 violation," and "no consideration in a technical sense" is required, nevertheless "the term 'agreement' does necessarily imply mutual consent." Up to this point we cannot complain of appellant's law or logic. (No claim has ever been made by the government that the conspiracy charged in paragraph 9 of the indictment consisted of written agreements (Tr. p. 12).)

Appellant then adds a definition to "mutual consent," *i. e.,* "an exchange of assurances to take or refrain from a giv-

---

5. As an example, counsel urges upon us that Esco's "participation was casual to say the least;" that "had there been a conspiracy of earth-shaking qualities charged by the government in this case, it should be reasonably safe to assume that Esco's representatives at the meetings would have told others in Esco about it." We first reject the theory that a little conspiracy to fix prices is to be overlooked. We next note we are referred to nothing in the record to establish Esco's representatives did *not* tell others. Proof that X and Y, employed by Esco, knew nothing about any agreement does not show that A or B employed by Esco were not told.

**1008**

en course of conduct." With this we disagree, if by it appellant means the existence of specific assurances. Written assurances it concedes, are unnecessary. So are oral assurances, if a course of conduct, or a price schedule, once suggested or outlined by a competitor in the presence of other competitors, is followed by all—generally and customarily—and continuously for all practical purposes, even though there be slight variations.

 It is not necessary to find an express agreement, either oral or written, in order to find a conspiracy, but it is sufficient that a concert of action be contemplated and that defendants conform to the arrangement. United States v. Paramount Pictures, Inc., 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948). Cf. also C-O-Two Fire Equip. Co. v. United States, 197 F.2d 489 (9th Cir.), cert. denied 344 U.S. 892, 73 S.Ct. 211, 97 L.Ed. 690 (1952). Mutual consent need not be bottomed on express agreement, for any conformance to an agreed or contemplated pattern of conduct will warrant an inference of conspiracy. United States v. Twentieth Century-Fox Film Corp., 137 F.Supp. 78 (S.D.Cal. 1961). An exchange of words is not required. Frey & Son, Inc. v. Cudahy Packing Co., 256 U.S. 208, 41 S.Ct. 451, 65 L.Ed. 892 (1921). Thus not only action, but even a lack of action, may be enough from which to infer a combination or conspiracy.

 Applying these rules to the facts at hand, the jury came to an opposite conclusion from that which appellant urges, and the fact that Esco's involvement was in but two of ten allegedly conspirational situations does not absolve Esco from participation in the entire conspiracy if its involvement in the two was unlawful and knowingly and purposely performed. We hold that sufficient evidence existed for the jury to find participation in a price-fixing conspiracy—entirely apart from the criticized admission of Government Exhibit 110 (infra). And with it and other somewhat similar documents before the jury, if all were properly introduced, the evidence of appellant's guilt is overwhelming.

We hold no error existed in denying appellant's motion for a judgment of acquittal on the ground of insufficiency of the evidence, and in denying the motion for new trial. There was a plethora of evidence, which if believed, convicted appellant of conspiring by joint action among competitors to fix prices, and subsequently to reduce the jobbers' discount from ten to five per cent within the market area, and to fix and maintain that price.

*V—Evidentiary Errors.*

We next consider Specification of Error 3—that the court erred in admitting into evidence acts and declarations of parties who were not standing trial with Esco. The admission of this allegedly irrelevant evidence was asserted to be prejudicial to defendant.

 The admissibility of this evidence depends entirely upon whether defendant Esco was a member of the conspiracy. We have held the evidence sufficient, under point IV, supra, to justify the trial court leaving this issue to the jury, which found Esco did so conspire. But, urges appellant (Brief, p. 8), "It is true that, where there are multiple defendants in a conspiracy case, the introduction of evidence relevant to [and therefore admissible against] one defendant but irrelevant to others is permissible, but only because in the absence of a severance * * * the introduction of such evidence is completely unavoidable. Clearly there is no counterpart in a single defendant case such as the case at bar." No case is cited in support of this proposition. It apparently is appellant's position that if all but one defendant pleaded nolo contendere in a conspiracy case, evidence as to conspiratorial acts, whether hearsay or not, in which the defendant on trial had not actively participated would not be *relevant* to prove a general conspiracy. (Brief, p. 42.) But the evidence is offered because of its relevancy to proof of conspiracy, not because of its relevancy to prove the sole defendant's

participation in that conspiracy. Its participation must be proved by evidence relating to *its* participation; the existence of the conspiracy may be proved by acts of *any* of the conspirators.

Defendant Esco was not charged here with committing a crime *by itself*—it happens to be the sole remaining defendant, but the crime charged is conspiring with others, as heretofore set forth. If, as counsel urges, the court admitted evidence of "alleged conspiratorial activities of persons not on trial" (Appellant's Brief, p. 42), allowing the evidence is only error if the second half of appellant's statement is also true, to-wit: "and with which Esco, the sole party on trial, had no connection." (Appellant's Brief, p. 42.)

The second part of Esco's thesis is simply not true. Esco did have a connection, and an active, if brief, connection and participation in the conspiracy. (IV, supra.) Lisenba v. California, 314 U. S. 219, 62 S.Ct. 280, 86 L.Ed. 166 (1941) and Sang Soon Sur v. United States, 167 F.2d 431 (9th Cir. 1948) state good law —but they are not pertinent here.

■ Defense of a charge of criminal conspiracy is admittedly a difficult matter. Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949). The order of proof, as well as the degree of proof necessary to establish the existence of a conspiracy and any particular defendant's participation therein, *before* proof of other conspirators' acts become relevant and admissible against all, present difficult problems to a trial judge. But this does not bar all evidence during the progress of a trial until a particular defendant's participation has been established; for if that were true, then, as here, a sole non-nolo pleading defendant could never be convicted.

■ The order of proof in a conspiracy case is a matter almost entirely within the discretion of the trial court, Anthony v. United States, 256 F.2d 50 (9th Cir. 1958); Cwach v. United States, 212 F.2d 520 (8th Cir. 1954), and therefore error could not be predicated upon admission of evidence as to the act of an alleged co-conspirator prior to proof that defendant was connected with the conspiracy. United States v. Sansone, 231 F.2d 887 (2d Cir.), cert. denied 351 U.S. 987, 76 S.Ct. 1055, 100 L.Ed. 1500 (1956). As we stated in Enriquez v. United States, 293 F.2d 788 (1961), admitting conversations of alleged conspirators prior to establishment of the conspiracy is primarily a problem of proper order of proof which is within the sound judicial discretion of the trial court.

■ It is not the law that one member of a conspiracy who refuses to plead nolo contendere should go free. The same rule of necessity applies, as it does with respect to the discretion of a trial judge as to order of proof. Here we cannot hold the wide discretion of the trial court was abused. A fair reading of the record discloses it was not.

We turn to alleged error number four, the admission of Exhibit 110 in evidence.

Government's Exhibit 110 reads as follows:

"You indicated that you felt quite confident that the stainless pipe on the Edwards Air Force Base job would go at a reduced price and I believe I stated that although I could not predict everyone's actions I did feel that the Western distributors would all be in line. I personally followed this quote up and as you probably know it went to Tubular Service of Pittsburgh, Pennsylvania who quoted mill prices f. o. b. the job site with no freight included in their price.

"Tubular Service was contacted and asked to explain their actions and it developed that they were surprised to learn that Edwards Air Force Base was in California and they had thought that it was outside of Denver, Colorado. Knowing that the price practices in the Rocky Mountain area were soft they thus went in at this marginal level. This seems

to have been an honest misunderstanding on their part, however, at any rate it gave us the opportunity to emphasize that any quoting on their part along the West Coast should be in respect of the practices and levels we are trying to maintain out here. This they understand and indicated they would respect.

"There will undoubtedly be other large inquiries where we will find Eastern competition. However, I would like to again emphasize the very keen interest and efforts that are being made by all of the Western distributors to maintain and follow our published price schedules and legitimate price practices. As in the above example, whenever we find a deviation we have been having very good and strengthening results by calling the deviator for re-aligning his practices. So far this has been most successful and has proved a much better approach then where everyone retaliates individually. As you well know this type of undertaking requires considerable effort and must be based upon the maintenance of communications and the existence of respect and confidence between all involved. This is not developed over night but I would like to let you know that considerable progress has been made in this direction and that in general I repeat what I said before that we feel conditions are better than they have been for many years among the Western distributors.

"One other area that I don't recall having discussed with you is that on *out of stock* sales of welded stainless the distributors along the West Coast are continuing to quote the old price levels rather than quoting the new reduced price bases. As soon as this situation is changed (and it will be dependent upon Tubesales making the change) and we will let you know. In the meantime I thought you would like to know that at least the Western distributors are using the old higher price bases at this time.

"For obvious reasons this letter has been written without reference to either our company name or my name and I would appreciate your destroying it. No file copy has been retained in this office."

As appellant phrases it, "a more inflammable and prejudicial document in the hands and minds of the jury could hardly be devised." We agree. Superimposed upon the other evidence of the meetings between competitors, the adherence to identical prices, the policing efforts, and the other evidence, both oral and written, from which a price-fixing conspiracy could be inferred, the existence of a well-conceived and cleverly thought-out conspiracy is strongly indicated.

This does not mean that this document proved that the appellant was a participant in such conspiracy. As the trial judge carefully instructed the jury—this letter was not signed; was not addressed to anyone; was discovered in the files of the Alaskan Copper Companies, Inc. (one of the confessed conspirators), a distributor of stainless-steel pipe and tubing (Tr. p. 273). Alaskan's tube price lists were at least partially copied from Tubesales' list. (Tr. p. 279.) Mr. Deshon of Kilsby had communicated with Alaskan during 1960 when Alaskan had reduced prices on its bids to supply stainless tube and steel along the Pacific Coast (Tr. p. 285). Smith had told Deshon that Alaskan would sell at "mill parity," i. e., Alaskan would respect published prices. Smith *intended* to inform Deshon he would conform to published prices on all contract prices; he informed Deshon he would abide by published prices on all *government* business. (Tr. p. 286.) Deshon told him (Smith) that Kilsby was adhering to these prices, as were other competitors. (Tr. p. 287.) Tagmyer, of Tubesales, advised Smith that they were adhering to published prices (Tr. p. 288). Tagmyer and Deshon told Rosen (Smith's counterpart in Alaskan's Seattle office)

the same thing. Alaskan then instructed its salesmen to adhere to the published price schedule. When Tubesales intended to bid below published prices on Edwards Air Force Base Jobs, Smith of Alaskan was given the figures to be used. (Tr. p. 291.) Before the Edwards Air Force bid was submitted, Smith had a conversation with Deshon, and told him he (Smith) did not think that mill parity prices would stand up on that particular price quotation. Deshon thought the competitors would bid the published prices. (Tr. p. 292.) Smith could not recall expressing such an opinion to anyone other than Deshon. (Tr. p. 293.)

Harmon, president of Tubesales, had previously been questioned about his conversation with Bialock, president of Tubular Service of Pittsburgh, Pennsylvania, with respect to a bid on an Edwards Air Force job, won by Tubular Service. Edwards Air Force Base was near Bakersfield, California. Harmon was concerned because the bid was so low, and discovered in his conversation with Bialock that Tubular Service had originally thought Edwards Air Force Base was located near Denver, Colorado, not Los Angeles—with a resulting "considerable" difference in freight rates (Tr. pp. 231–32). Harmon accepted Bialock's explanation, related it to Deshon of Kilsby, as well as "people in his own organization," and no one else. (Tr. p. 234.) When shown Government Exhibit 110, Harmon denied writing it. (Tr. p. 235, ll. 20–21.)

With this background, we physically examine Government Exhibit 110. It was identified by an Alaskan employee as coming from the files of Alaskan. It bears on its reverse side the incoming mail stamp of Alaskan, dated September 5, 1960. (Tr. p. 293.)

6. "THE COURT: Did you write that letter?
"WITNESS: [Mr. Deshon] You are asking me?
"THE COURT: Yes.
"MR. DESHON: I can't recall ever having written this letter.
"MR. BANKS: [for the Government] Do you deny having written it?

Smith first saw the letter on his desk at Alaskan *in the mail*. (Tr. p. 296.) Smith glanced at it. When he read the first sentence he thought it was written by Deshon (Tr. p. 299). The reason seems obvious, for the first sentence refers to the conversation between Deshon and Smith *only*. (Tr. p. 300.) Other subjects later mentioned in the letter, discussed only by Smith with Deshon, confirmed Smith's belief that the letter was written by Deshon. (Tr. pp. 300, 303.)

The second paragraph of Exhibit 110 tells of Harmon's call to Bialock. Only Deshon and Tubesales employees were told of this conversation. Harmon had denied having written the letter. Deshon, alone, of the principal actors in these proceedings, had knowledge of Harmon's conversation with Bialock, so accurately described in that second paragraph.

Deshon did not deny he had written the letter. His answers with respect to whether he had or had not, in view of the foregoing evidence, are enlightening.[6] Smith of Alaskan "thought" Deshon wrote Exhibit 110. (Tr. p. 317.)

Appellee argued that with the foregoing foundation, the government had established, not the "absolute" authenticity of the letter, but a prima facie case of its authenticity. Appellant urged that a prima facie case as to its authenticity had not been established.

The court, in the absence of the jury, observed that Esco was not mentioned in the letter; that if admissible at all, it was to prove the existence of a general conspiracy among competitors in which Esco may or may not have participated; and that he would permit the jury to determine if Deshon wrote the letter to Alaskan.[7]

"MR. DESHON: Well, I deny knowledge of the subject matter in the letter.
"Q. At this time?
"A. Yes. * * *" (Tr. p. 152.)

7. "THE COURT: That is the only thing I'm saying. I'm not saying they did write the letter, but I say that the Jury may be able to find that he [Deshon]

The court then asked Smith two questions:

"The Court: \* \* \* Who do you think wrote the letter?

"Smith: Mr. Deshon.

"The Court: Why was it filed in file K?

"Smith: This, I don't know.

"The Court: Well, is that K 'Kilsby'?

"Smith: It could be, yes. It could be."

(Tr. p. 318.)

wrote the letter, and that this was an admonition to him [Smith of Alaskan] or an explanation of why prices were not being maintained.

\* \* \* \* \*

"I am going to tell the jury as forcefully as I know how that this does not establish its authenticity. \* \* \* And then I am going to tell them that Alaskan and Kilsby had some arrangement but this document does not tie in Esco in any way, and they will have to wait to see whether there is any testimony to connect Esco with a conspiracy, if they find one existed." (Tr. p. 314.)

8. "THE COURT: Now, ladies and gentlemen, I'm going to permit a letter to be admitted in evidence. This is an anonymous letter, and while Mr. Smith thinks it may have come—or thinks it came from Mr. Deshon, that doesn't establish that it came from Mr. Deshon; and you will have to determine if, after you have heard all the evidence in the case, whether the letter is an authentic letter, and whether Mr. Deshon in fact wrote the letter. The mere fact that something is in writing, doesn't necessarily mean that all the facts stated in the letter are true, or that any part of it is true.

"I also want to call your attention to the fact that this letter, which you are about to hear, does not refer to the defendant, Esco; and even though this letter may tend to prove some improper relations between Alaskan and Kilsby (sic) and Tubesales, or any number of them, that does not mean that Esco had any part, or was a party, to any such arrangement. A great deal of testimony has come in yesterday and again this morning on arrangements between certain firms in the industry. That's on the first point that the Government must prove; namely, that there was a price

The court was then requested by appellant to instruct the jury, and he did so, as appears in the margin.[8] The jury was again instructed with respect to the letter in almost similar words at the conclusion of the trial. (Tr. p. 957, l. 17 to p. 958, l. 7.)

■ We hold the trial court properly exercised its discretion in permitting the letter (Gov's Ex. 110) to be introduced into evidence, for the limited purpose twice expressed by it to the jury.[9] Lewis v. United States, 38 F.2d 406, 416 (9th Cir. 1930); Carbo v. United States, 314

fixing arrangement between some people in the industry.

"Now, but once the Government has established that, that doesn't mean that Esco is liable until and unless the Government proves beyond a reasonable doubt and to a moral certainty that Esco was a part of this agreement, or adopted this conspiracy.

"I think that's sufficient. Is there anything else that—a cautionary instruction that either the Government or the defendant think I should give with reference to this matter."

"MR. McBRIDE: Fine with me.

"MR. BANKS: I have none, your Honor."

9. We must also keep in mind that the question of the authenticity of Exhibit 110 was not presented to the jury in any vacuum.

For example, Exhibit 79 (already in evidence was a memorandum dated March 31, 1961, written by R. E. Deshon, general manager of Kilsby, addressed to William H. Hayes, sales manager of Kilsby, and four of Kilsby's employees (who sold or priced stainless steel pipe), which reads as follows:

"March 31st, 1961

"To meet existing competitive practices we will henceforth quote all *FORMAL* Federal Government invitations to bid as competitively as possible. This suggests using sources that offer the most competitive prices and making an effort to obtain special prices to use on these highly competitive quotes.

"Although this policy permits a departure from our past practice of always quoting established mill parity prices, we nevertheless should not quote any prices whereby we will realize less than 4½% to 5% gross profit."

On April 4, 1961, Deshon of Kilsby wrote to his competitor, Smith of Alas-

F.2d 718 (9th Cir. 1963), leave to file supplement to petition for cert. granted 376 U.S. 901, 84 S.Ct. 655 (1964). VII, Wigmore, Evidence 3d ed., "Authentication by Contents," and cases cited, n. 3.

What appellant really objects to is the extent, nature and policing of the conspiracy proved by the letter as to Kilsby, Tubesales and Alaskan Copper. If other evidence proves Esco participated in the conspiracy, (and we have ruled there was sufficient evidence before the jury to justify such a conclusion) then Esco was involved in an illegal and audacious price-fixing conspiracy, carefully planned and organized. But we know of no way a defendant's participation in any conspiracy can be proved except by first proving the existence of a conspiracy. Proof of its operations may be "inflammable and prejudicial" to a jury, but proof of any crime, for that matter, involves admission of evidence which prejudices the defendant in the eyes of the jury.

We cannot understand appellant's concern with such detail as (a) that the exhibit bore no date other than a filing date, (b) that no envelope was attached, (c) that the filing date September 5, 1960 was Labor Day, or (d) that the date when Smith of Alaskan first saw it was not established. It has always been conceded that the letter was not addressed to anyone. We cannot agree with appellant that the third paragraph "is so ambiguous" that it did not refer to a general plan of price stabilization. (Appellant's Brief, p. 49.) And even were we to grant that there was little proof of "exclusive knowledge" of the statements made in the *third* paragraph of Exhibit 110, that in no way impairs the validity of the exclusiveness of the knowledge displayed by the author in paragraphs 1 and 2, hereinbefore recited. Bialock knew of it, but it seems incredible he could have written it; Harmon could have written it, but he denied it. Deshon could have written it, and he would not deny it. The question of its authenticity was one for the jury, subject always to the sound judicial discretion of the trial judge. The rule is aptly expressed by Judge Merrill of this court in his Carbo decision, supra. Appellant without citing another case concedes that Carbo holds that circumstantial evidence may prove authenticity, but cannot "support the admissibility of irrelevant, hearsay information." It is irrelevant and

kan, as appears in Government Exhibit 108, consisting of two pages, which was also ready in evidence:

[Page 1] "April 4th, 1961
"Mr. Lewis E. Smith, Manager, Oregon Division
Alaskan Copper & Brass Company
939 S. E. Alder
Portland, Oregon
"Dear Lew:

"It has been some time since we corresponded and, in general, I suppose this is good because from our point of view we have had no occasions which would provoke our previous types of correspondence.

"From all signs, it appears to us that our general program is working very well and our efforts are paying off.

"A recent development is reflected in the attached memo which we have just issued to our inside people and which I felt you should be aware of. This was necessitated by the large number of sources involved on this type of business. If you have any questions, please let me know.
"Very truly yours,
KILSBY-TUBESUPPLY
/s/ BOB

R. E. Deshon, General Manager"
[Page 2]
"TO: ALL INSIDE PERSONNEL
"To meet existing competitive practices we will henceforth quote *formal* Federal government 'Invitations to Bids' at competitive levels. This policy permits, but does not demand, a departure from our past practice of always quoting established mill parity prices, however, it is to be allowed only on the *FORMAL* written government quotations."

These are but two examples of written evidence tying Alaskan into the planned concert of action between competitors in this industry in the market area in price-fixing. Many other examples exist in the record, with its several hundred exhibits. This background of admitted correspond-

inadmissible hearsay only if Esco had never been proved to have joined the conspiracy. As we hold above, there was sufficient evidence to go to the jury on both the question of a conspiracy and Esco's participation in it. Both issues were decided adversely to appellant, and the jury's determination becomes binding on us where it is supported by sufficient evidence in the record. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

Finding no error, we affirm.

ence and trading of information, much of it surreptitious or using guarded language, must be considered in weighing the probability of the authenticity of proffered Government's Exhibit 110.