Glen L. WILCOX, Lorraine Wilcox, Wilcox Development Company, Mid-Willamette Village Ore., Ltd., individually and on behalf of all others similarly situated; Michael F. Montgomery and Rosemary Montgomery; Kunkle and Stone, Inc., Plaintiffs-Appellants,

v.

FIRST INTERSTATE BANK OF OREGON, N.A., a national banking association and First Interstate Bancorp., Defendants-Appellees.

Nos. 85–3640, 85–3643, 85–3644.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 8, 1986.

Decided April 17, 1987.

As Amended June 3, 1987.

Boochever, Circuit Judge, filed dissenting opinion.

Henry A. Carey, Leslie M. Roberts, Phil Goldsmith, and Roger G. Tilbury, Portland, Or., for plaintiffs-appellants.

James H. Clarke, Portland, Or., for defendants-appellees.

Before SKOPIL, NELSON and BOOCHEVER, Circuit Judges.

SKOPIL, Circuit Judge:

These are actions brought by commercial borrowers against their bank, alleging violations of section 1 of the Sherman Act, 15 U.S.C. § 1 (1982), and the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–68 (1982). The district court granted the bank's motions for summary judgment on the RICO claims and denied summary judgment on the antitrust claim. A jury returned verdicts in favor of the borrowers in their antitrust action. That verdict was subsequently overturned by the district court when it entered judgment notwithstanding the verdicts (JNOV). We affirm the entry of JNOV and reverse the grant of summary judgment on the RICO claims.

## FACTS AND PROCEEDINGS BELOW

Plaintiffs-appellants in these three consolidated actions were commercial borrowers of First Interstate Bank of Oregon

("FIOR").[1] The borrowers negotiated business loans from FIOR at interest rates based on FIOR's prime rate for ninety-day commercial loans plus an "add on" depending on the risk of each loan. Thus, the interest rates on the loans were variable and fluctuated with changes in FIOR's prime rate.

Following default or full payment of the loans, the borrowers filed actions alleging that defendants-appellees [2] violated section 1 of the Sherman Act by conspiring to fix FIOR's prime rate at a uniform, non-competitive level. The borrowers claim that FIOR conspired with one or more of four First Interstate Bancorp ("Bancorp") subsidiary banks, the Bank of America, and/or the United States National Bank of Oregon. The borrowers also alleged that FIOR violated RICO by using the mail to charge and collect excessive interest based on deceptive overstatements of FIOR's true prime rate.

The cases were consolidated for trial. The district court denied class certification, denied the borrowers' motions to amend their RICO "enterprise" allegations, and thereafter granted the bank's summary judgment motion on the RICO claims. A jury returned verdicts for the borrowers on the antitrust claims. The district court awarded attorneys fees pursuant to the jury verdict, but subsequently granted defendants' motions for judgment notwith-

standing the verdict and, alternatively, for a new trial.

This timely appeal followed. The borrowers challenge the district court's (1) refusal to certify a plaintiff class, *Wilcox Development Co. v. First Interstate Bank*, 97 F.R.D. 440 (D.Or.1983); (2) grant of summary judgment on the RICO claim, *Wilcox Development Co. v. First Interstate Bank*, 590 F.Supp. 445 (D.Or.1984); (3) award of attorneys fees on the Sherman Act claims as insufficient, *Wilcox Development Co. v. First Interstate Bank*, (D.Or. Oct. 5, 1984) (mem.); and (4) grant of the bank's motion for JNOV or, alternatively, for a new trial on the Sherman Act verdicts, *Wilcox Development Co. v. First Interstate Bank*, 605 F.Supp. 592 (D.Or. 1985). The borrowers also seek attorneys fees on appeal pursuant to 15 U.S.C. § 15 (1982) and 18 U.S.C. § 1964(c).

We decide only the antitrust and RICO issues. Our disposition of those issues makes it unnecessary to reach the class certification, grant of a new trial on the antitrust claims, or the sufficiency of the attorneys fee award below.[3]

## DISCUSSION

### A. *Sherman Act.*

In reviewing a district court's grant of JNOV, we apply the same standard applied by the district court. *See Peterson v. Kennedy*, 771 F.2d 1244, 1252 (9th Cir.

1. The consolidated cases are: *Wilcox v. First Interstate Bank*, CA No. 85–3640, DC No. 81–1127–RE); *Kunkle & Stone, Inc. v. First Interstate Bank*, CA No. 85–3644, DC No. 83–1766–RE); and *Montgomery v. First Interstate Bank*, CA No. 85–3643, DC No. 83–1909–RE). Unless otherwise noted, plaintiffs-appellants' interests are identical and they will be referred to collectively as "borrowers."

 A fourth consolidated case, *Kunkle v. First Interstate Bank*, CA No. 85–3641, DC No. 82–754–RE (ER 19), was dismissed from this appeal pursuant to settlement.

2. Defendants-appellees are FIOR in all three cases and FIOR's corporate parent, First Interstate Bancorp ("Bancorp"), in *Wilcox* only. Unless otherwise noted, defendants-appellees' interests are identical and they will be referred to collectively as "FIOR" or "bank."

3. Since we affirm the entry of JNOV, we need not reach the district court's alternative grant of

a new trial. *See* Fed.R.Civ.P. 50(c)(1) (providing for conditional ruling on grant of new trial). Nor is it necessary for us to review the adequacy of the award of attorney's fees. Although we do reverse the grant of summary judgment on the RICO claims, we are unable to reach the borrowers' assertion of error in the district court's refusal to certify a class action. That issue need not be decided because "orders regarding certification and decertification of class actions should not be reviewed by this court when the judgment pursuant to which appeal was taken is reversed or vacated and the case remanded." *Weil v. Investment/Indicators, Research & Management, Inc.*, 647 F.2d 18, 27 (9th Cir.1981). *See also Alaska v. Chevron Chem. Co.*, 669 F.2d 1299, 1303 n. 8 (9th Cir.1982) (to decide class certification issue on appeal when judgment is reversed is to rule impermissibly on an interlocutory order).

1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 1642, 90 L.Ed.2d 187 (1986). JNOV is proper when the evidence permits only one reasonable conclusion as to the verdict. *Id.* The district court's decision must be affirmed if "without accounting for the credibility of the witnesses, we find that the evidence and its inferences, considered as a whole and viewed in the light most favorable to the nonmoving party, can support only one reasonable conclusion—that the moving party is entitled to judgment notwithstanding the adverse verdict." *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.*, 668 F.2d 1014, 1026 (9th Cir.1981), *cert. denied*, 459 U.S. 825, 103 S.Ct. 58, 74 L.Ed.2d 61 (1982). Neither the district court nor this court is free to weigh the evidence or reach a result it finds more reasonable if the jury's verdict is supported by substantial evidence. *Id.; see also Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1013–14 (9th Cir.1985) ("standard for reviewing a jury verdict is whether it is supported by substantial evidence"), *cert. denied*, —— U.S. ——, 106 S.Ct. 802, 88 L.Ed.2d 778 (1986).

■ An action under section 1 of the Sherman Act requires proof of a contract, combination, or conspiracy in restraint of trade. 15 U.S.C. § 1. The essence of a section 1 claim is concerted action. *Cooper v. Forsyth County Hospital Authority, Inc.*, 789 F.2d 278, 280 (4th Cir.1986). "The determinative question presented ... is whether appellants have proffered sufficient evidence of a conspiracy...." *Id.* The borrowers must present "direct or circumstantial evidence that reasonably tends to prove that the [defendants] 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.'" *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 (1984) (quoting *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 111 (3d Cir.1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981)).

■ The borrowers allege that FIOR conspired with other banks to set a non-competitive prime rate. Horizontal price setting is illegal *per se. Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768, 104 S.Ct. 2731, 2740, 81 L.Ed.2d 628 (1984). The borrowers are not required to prove that defendants entered into an express agreement to fix prices. An agreement may be inferred from circumstantial evidence of "a common design and understanding, or a meeting of minds in an unlawful arrangement...." *American Tobacco Co. v. United States*, 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946). Nevertheless, when relying solely on circumstantial evidence, a plaintiff must present evidence from which an inference of conspiracy is more probable than an inference of independent action. *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 280, 88 S.Ct. 1575, 1588, 20 L.Ed.2d 569 (1968). The plaintiff's burden is to produce evidence "that is capable of sustaining a rational inference of conspiracy and that tends to exclude the possibility that the defendant acted independently of the alleged coconspirators, and thus lawfully." *T.W. Electric Service v. Pacific Electric Contractors*, 809 F.2d 626, 632 (9th Cir.1987). Thus, antitrust law limits the range of permissible inferences from ambiguous evidence. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1357, 89 L.Ed.2d 538 (1986). "[C]onduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Id.* (citing *Monsanto*, 465 U.S. at 764, 104 S.Ct. at 1471).

■ The borrowers argue that the record contains substantial evidence to support the jury's conclusion that defendants violated section 1 of the Sherman Act. They rely on circumstantial evidence. In determining whether an agreement can be inferred from circumstantial evidence, a series of "plus factors" have been considered. *C–O–Two Fire Equipment Co. v. United States*, 197 F.2d 489, 493 (9th Cir.), *cert. denied*, 344 U.S. 892, 73 S.Ct. 211, 97 L.Ed. 690 (1952). Such factors may include price parallelism, product uniformity, exchange of price information, and opportuni-

ty to meet to form anti-competitive policies. *Id.* at 493, 497. We examine the borrowers' evidence of such factors and the bank's explanations of their practices to determine if an "inference of conspiracy is reasonable in light of the competing inferences of independent action...." *Matsushita,* 106 S.Ct. at 1357. In our review we take special caution to give the borrowers "the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Independent Iron Works, Inc. v. United States Steel Corp.,* 322 F.2d 656, 661 (9th Cir.) (quoting *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 699, 82 S.Ct. 1404, 1410, 8 L.Ed.2d 777 (1962)), *cert. denied,* 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 165 (1963).

■ The borrowers cite to evidence of various factors to support an inference of price fixing. First, they rely on the almost absolute parallelism of FIOR's prime rate caused by FIOR's practice of changing its prime rate whenever any four of seven specific banks changed theirs. Second, the borrowers note an exchange of price information through publication by the wire services of their prime rates. Third, they argue that meetings of top officials of Bancorp and its five largest subsidiary banks, including FIOR, facilitated the exchange of information which was used to set non-competitive prime rates ("in-house meetings"). Finally, they contend that other bankers' meetings attended by FIOR and the alleged conspirator banks were convened for the sole purpose of setting non-competitive interest rates ("outside meetings").

■ FIOR does not deny its parallel movement of prime rates. Such business behavior is insufficient by itself to establish an agreement in violation of the antitrust laws. *Ralph C. Wilson Industries, Inc. v. Chronicle Broadcasting Co.,* 794 F.2d 1359, 1365 (9th Cir.1986); *Granddad Bread, Inc. v. Continental Baking Co.,* 612 F.2d 1105, 1112 (9th Cir.1979), *cert. denied,* 449 U.S. 1076, 101 S.Ct. 854, 66 L.Ed.2d 798 (1981). FIOR contends that its practice of following other banks' prime

rate setting is rational conduct motivated by legitimate business concerns. Changes in the national prime rate reflect changes in economic conditions. FIOR contends it follows the lead of other major banks because to do otherwise would be against its self-interest. In *United States v. International Harvester Co.,* 274 U.S. 693, 47 S.Ct. 748, 71 L.Ed. 1302 (1927), the Court acknowledged as lawful, competitors' practice of independently, and as a matter of business judgment, following the prices of an industry leader. "[T]he fact that competitors may see proper, in the exercise of their own judgment, to follow the prices of another manufacturer, does not establish any suppression of competition or show any sinister domination." *Id.* at 708–09, 47 S.Ct. at 754. Reliance on other banks' prime rate changes is a convenient and accurate way for FIOR to maintain its prime rate at the level set by the national market. Additionally, FIOR is the only Bancorp subsidiary that uses this "count-to-four" method. This indicates independent action.

■ The borrowers rely on *United States v. Container Corp. of America,* 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969), to support their second factor, exchange of price information. In *Container Corp.,* the conspirators exchanged information of their most recent prices charged to individual customers. This confidential information concerned "specific sales to identified customers, not a statistical report on the average cost to all [customers]." *Id.* at 334, 89 S.Ct. at 511. The Court found that such an exchange of information had an anticompetitive effect on the industry, "chilling the vigor of price competition." *Id.* at 337, 89 S.Ct. at 512. An agreement to fix prices, though informal, was nevertheless present. In contrast, the prime rate information disseminated over wire services is public. *See Hanson v. Shell Oil Co.,* 541 F.2d 1352, 1360 (9th Cir.1976) (exchange of readily available public information does not support inference of conspiracy), *cert. denied,* 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977). The prime rate is more indicative of an average cost be-

cause most loans are negotiated at interest rates either a certain percentage above or below prime. Thus disclosure of the prime rate does not enable competitors to conspire to fix prices and does not necessarily constitute a violation of the antitrust laws. *See Battipaglia v. New York State Liquor Authority,* 745 F.2d 166, 174–75 (2d Cir. 1984) (mere exchange of price information is not itself violative of the antitrust laws), *cert. denied,* 470 U.S. 1027, 105 S.Ct. 1393, 84 L.Ed.2d 782 (1985). An exchange of price information which constitutes reasonable business behavior is not an illegal agreement. *Supermarket of Homes, Inc. v. San Fernando Valley Board of Realtors,* 786 F.2d 1400, 1407 (9th Cir.1986).

The borrowers rely on *Esco Corp. v. United States,* 340 F.2d 1000 (9th Cir.1965), to support their third and fourth factors, in-house and outside meetings attended by officials of FIOR and Bancorp. In *Esco,* the court affirmed a jury verdict against defendant for violation of section 1 of the Sherman Act. Whether meetings, which provided the opportunity to fix prices, could support an inference of conspiracy was a question left primarily to the jury. *Id.* at 1007. The borrowers argue that both the in-house meetings and outside meetings were convened for the primary, if not exclusive, purpose of setting non-competitive prime rates.

The bank contends that the in-house meetings attended by top officials of Bancorp and its largest subsidiaries, including FIOR, cannot support an inference of conspiracy. *See Copperweld,* 467 U.S. 752, 104 S.Ct. 2731. In *Copperweld,* the Supreme Court held that a parent corporation as a matter of law could not conspire with its wholly owned subsidiary. *Id.* at 771–72, 104 S.Ct. at 2741–42. The bank contends the same reasoning should apply to sister corporations. We do not need to decide whether *Copperweld* should be extended to sister corporations because our review of the evidence discloses that there was no

evidence of any agreement to set interest rates at the in-house meetings. At the most it was shown that Bancorp and its subsidiaries concluded that setting a system-wide prime rate would be undesirable.

The bank contends the outside meetings are necessary to discuss interest rates on participation loans because lenders must agree on participation loan terms including interest rates.[4] In *Weit,* 641 F.2d at 462, defendant banks allegedly conspired to fix credit card interest rates at a non-competitive level. The court rejected the claim of conspiracy. "Given the need for some degree of cooperation in a venture of this nature, the opportunity to conspire evidence lacks significant probative value." *Id. Weit* is analogous because cooperation is a necessary incident to participation loans. *See also Zoslaw v. MCA Distributing Corp.,* 693 F.2d 870, 885 (9th Cir.1982) (in absence of agreement, evidence of industry meetings is not sufficient to prove a conspiracy), *cert. denied,* 460 U.S. 1085, 103 S.Ct. 1777, 76 L.Ed.2d 349 (1983).

We conclude from our review of the record that the bank fully rebutted each plus factor offered by the borrowers. The borrowers have failed to present evidence that tends to exclude the possibility that the alleged conspirators acted independently. *See Barry v. Blue Cross,* 805 F.2d 866, 869 (9th Cir.1986) (interdependence is a necessary condition for inferring a conspiracy from parallelism). That conclusion does not, however, end our inquiry. We have held that conscious parallel conduct may allow for an inference of agreement if it is also shown that each conspirator acted against its own self-interest by engaging in the parallel behavior. *Zoslaw,* 693 F.2d at 884. That is, "the decision to act was not based on a good faith business judgment." *Id.*

The borrowers argue that prime rate parallelism is not the result of FIOR's good faith business judgment. They contend

---

**4.** A participation loan is an arrangement by which outside banks (participating banks) purchase portions of a loan extended by another bank (the lead bank). Participation loans are usually created when a single bank has exceeded its lending limits as imposed by state law or in-house rules. The interest rate applicable to a participation loan is generally negotiated individually by the lending bank and the borrower.

that prior to the mid–1970s businesses could not borrow funds from FIOR below FIOR's published prime rate. Beginning in the late 1970s, large and powerful borrowers could obtain loans from FIOR at sub-prime rates. At the same time, FIOR's "middle-market" borrowers, such as plaintiffs here, were still required to negotiate their loans based on the prime rate. The borrowers contend that the sub-prime rates available in the alternate market demonstrates competition for borrowers. Such competition arguably should have expanded into the middle-market for funds if each bank had acted in its own self-interest. The borrowers also argue that the bank's motivation to fix a prime rate at a non-competitive level is to stabilize profits by avoiding competitive forces that could bring interest rates down.

We conclude that FIOR's practices are motivated by legal, non-collusive business practices. Near uniformity in prime interest rates reflects a competitive market for funds. Prime rates will arguably be nearly identical when each bank pursues its individual self-interest because failure to follow national prime rates could cause either losses or severe liquidity problems. FIOR presented credible, rebutting evidence that sub-prime loans and prime based loans are offered to different classes of borrowers and that both markets are highly competitive; that middle-market customers are not strong or secure enough to enter the sub-prime market; and that the prime based loans carry higher risks and are influenced by the national prime rate which theoretically reflects all relevant business conditions influencing the cost of funds.

The present case is analogous to *Zoslaw* in that the bank has created a two-tier system of interest rates based on the competition for borrowers and the risk of individual loans. A two-tier pricing system is not inherently non-competitive unless it can be shown to be related to an anti-competitive agreement. *See Granddad Bread*, 612 F.2d at 1112 (JNOV for defendant affirmed because two-tier pricing scheme not related to alleged conspiracy). There has been no such showing here. The actions alleged to constitute a conspiracy are precisely those that could be motivated by independent self-interest. The borrowers neither carried their burden of proving that an inference of conspiracy was more probable than an inference of concerted action nor did the jury base its verdicts on substantial evidence.

## B. RICO.

The borrowers' RICO claims are based on their theory that FIOR's announced prime rate was not in fact the most favorable rate offered to its most credit-worthy commercial borrowers. The borrowers allege that FIOR's concealment of sub-prime lending rates and imposition of excessive interest rates was fraudulent. FIOR's use of the United States Postal Service to mail notices of the inflated interest charges allegedly constitutes racketeering activity under 18 U.S.C. § 1961(1)(B). The borrowers further allege that FIOR engaged in a pattern of racketeering activity as defined in 18 U.S.C. § 1961(5) and violated the substantive prohibitions of 18 U.S.C. §§ 1962(a), (c), and (d).[5]

The district court held that FIOR was entitled to summary judgment because (1)

---

5. These sections prohibit:

(a) ... any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, [18 U.S.C. § 2] to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect interstate or foreign commerce.

(c) ... any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt. (d) ... any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.

18 U.S.C. §§ 1962(a), (c), and (d).

the borrowers "improperly alleged that [the banks] were also the affected enterprises" and (2) the borrowers "fail[ed] to allege and prove they suffered a racketeering enterprise injury." The district court denied borrowers' motions to amend their "enterprise" allegations "because plaintiffs' alternative enterprise theories do not solve the problem that plaintiffs have sued the enterprise and not the alleged racketeer."

Summary judgment is appropriate when the moving party establishes that it is entitled to judgment as a matter of law and that no genuine issue of material fact exists. *Kaiser Cement Corp. v. Fischbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 435, 93 L.Ed.2d 384 (1986). A grant of summary judgment is reviewed *de novo. Id.* On review of the record, we must view the evidence and inferences in a light most favorable to the party opposing summary judgment. *Id.* The denial of a motion to amend is reviewed for an abuse of discretion. *Wood v. Santa Barbara Chamber of Commerce, Inc.*, 705 F.2d 1515, 1520 (9th Cir.1983), *cert. denied,* 465 U.S. 1081, 104 S.Ct. 1446, 79 L.Ed.2d 765 (1984).

### (a) Racketeering enterprise injury

 The Supreme Court recently expressly rejected the "racketeering enterprise injury" rule relied on by the district court. *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 495, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985). Unless manifest injustice results, we apply the law as it exists at the time of our decision. *In Re Rubin*, 769 F.2d 611, 614 (9th Cir.1985) (citing *Bradley v. School Board of Richmond*, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974)). In *Sedima* the Supreme Court concluded that " 'racketeering activity' consists of no more and no less than commission of a predicate act, § 1961(1) ...." 105 S.Ct. at 3285. The Court emphasized that a plaintiff still must allege each element prescribed in the statute to state a claim. The statute, however, requires no more. The compensable injury is the harm caused by the predicate act relied upon. *Id.* at 3286. Further, a plaintiff can recover for both the direct harm flowing from a defendant's conduct and the indirect harm such as "competitive injury." *Id.* at n. 15. *See also American National Bank & Trust Co. v. Haroco, Inc.*, 473 U.S. 606, 105 S.Ct. 3291, 3292, 87 L.Ed.2d 437 (1985) (per curiam) (reaching same conclusions); *Simon Oil Co., Ltd. v. Norman*, 789 F.2d 780, 781 (9th Cir.1986) (*Sedima* clearly rejected the requirement of "racketeering injury" and an injury distinct from that caused by the predicate act).

### (b) "Person/enterprise" distinction

 In *Rae v. Union Bank*, 725 F.2d 478, 481 (9th Cir.1984), we rejected the argument that a corporate defendant could be both the RICO person and the RICO enterprise under 18 U.S.C. § 1962(c). We reasoned that a RICO enterprise refers " 'to a being different from, not the same as or part of, the person whose behavior the Act was designed to prohibit.... ' " *Id.* (quoting *United States v. Computer Sciences Corp.*, 689 F.2d 1181, 1190 (4th Cir. 1982), *cert. denied,* 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983)). *Accord Haroco, Inc. v. American National Bank & Trust Co.*, 747 F.2d 384 (7th Cir.1984), *aff'd on other grounds,* 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985). Following our decision in *Rae*, the borrowers sought to amend their "enterprise" allegations to add that (1) Bancorp, as FIOR's parent corporation, and (2) an "association fact" of all officers and employees of FIOR and Bancorp who participate in lending activities, constitute the RICO enterprise. The district court denied the amendments.

We recently decided that unlike section 1962(c), sections 1962(a) and (b) do not necessarily require that the "person" be distinct from the "enterprise." *Schreiber Distributing Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1398 (9th Cir.1986). "[W]here the corporation is the direct or indirect beneficiary of the pattern of racketeering activity, it can be both the 'person' and the 'enterprise'.... " *Id.; see also Schofield v. First Commodity Corp.*, 793 F.2d 28, 31 (1st Cir.1986) ("section 1962(a) does not require a relationship between the

person and the enterprise as does section 1962(c), and so it does not require the involvement of two separate entities"); *Masi v. Ford City Bank & Trust Co.*, 779 F.2d 397, 402 (7th Cir.1985) (under section 1962(a) a bank may be both person and enterprise).

The borrowers argued below in opposition to summary judgment that a corporation, such as FIOR, could simultaneously be named as a RICO defendant and also provide the RICO enterprise element under section 1962. Such a possibility is evidenced by our decision in *Schreiber*. The borrowers further argued below that even if they were required to plead a RICO enterprise separate from the RICO defendant, that fact could be discerned from their pleadings and materials supplied in opposing the motion for summary judgment. Finally, the borrowers assert that their proposed amended pleadings clearly allege separate RICO persons and enterprises and thus conform with *Rae*.

We conclude that, instead of sorting out the various possible interpretations attributable to the pleadings, the borrowers should be given the opportunity to amend their pleadings to conform with our recent decisions in *Schreiber* and *Rae*. *See* Fed. R.Civ.P. 15 (allowing amendment of pleadings "when justice so requires"); Fed.R. Civ.P. 16(e) (allowing amendment of pretrial order to prevent "manifest injustice"). We do not agree with the district court that the borrowers' arguable deficiencies in

pleading cannot be overcome by amendment. *See Kempe v. Monitor Intermediaries, Inc.*, 785 F.2d 1443, 1444 (9th Cir. 1986) (deficiency in RICO pleading readily correctable by amendment). Changes in the law since the district court's decision prompt us to allow the borrowers the opportunity to amend on remand.

(c) Collateral estoppel

■ The bank argues that the borrowers should be collaterally estopped from pursuing RICO claims based on the predicate act of mail fraud. Although the district court did not rely on this theory in granting summary judgment, we nevertheless review the contention since we may affirm the district court on any basis in the record. *See Salmeron v. United States*, 724 F.2d 1357, 1364 (9th Cir.1983).

The bank contends that because a jury previously rendered adverse verdicts on borrowers' common law fraud claims, the borrowers are precluded from litigating mail fraud claims as part of the RICO action. The bank reasons that the common law vedicts "established that one or more elements of plaintiffs' claims were not proved," and that common law fraud claims and the RICO mail fraud claims are equivalent because they "involve essentially the same underlying factual allegations."[6]

■ The borrowers contend that the elements of their RICO claims are not identical to the elements of common law fraud

---

**6.** There is judicial support for the bank's position. *See, e.g., HMK Corp. v. Walsey*, 637 F.Supp. 710, 714 n. 5 (E.D.Va.1986) ("case law abounds with decisions under RICO granting preclusive effect to prior judgments"). In *Brannan v. Eisenstein*, 804 F.2d 1041, 1047 (8th Cir. 1986), the court, affirming the dismissal of a RICO action, reasoned that since it "affirmed the dismissal of the securities fraud claims, the same conduct cannot constitute a fraudulent scheme giving rise to a wire fraud claim." *See also Greenblatt v. Drexel Burnham Lampert, Inc.*, 763 F.2d 1352, 1362 (11th Cir.1985) (arbitral decision, though not containing specific factual findings, demonstrated that the plaintiff would not be able to prove predicate acts necessary to support a RICO violation); *Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 19–20 (2d Cir.1983), *cert. denied*, 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984) (dismissal of securities fraud

claim undercuts the existence of racketeering activity so that dismissal of RICO claim was justified); *Berns v. O'Dell*, 563 F.Supp. 1201, 1203 (E.D.Mo.1983) (RICO claim based on mail fraud was precluded by a prior adverse jury verdict on claims of securities fraud and common law fraud arising out of the same operative facts), *aff'd per curiam*, 726 F.2d 409 (8th Cir. 1984). Similarly, in *County of Cook v. Midcon Corp.*, 773 F.2d 892, 898 (7th Cir.1985), the court affirmed the dismissal of a RICO action on collateral estoppel grounds because "the propriety of each element of the alleged scheme to defraud was previously decided in the state court...." Given the explicit findings by the state judge, "all the essential features of the alleged scheme to defraud were already considered, and found to be without merit...." *Id.* at 899–900.

and hence could not have been decided in the prior action.[7] We need not decide if the elements are identical because collateral estoppel cannot apply for another reason. The borrowers were required in their jury trial to prove their common law fraud claims by clear and convincing evidence. If their burden on the RICO allegations is the lesser standard of proof by a preponderance of the evidence, they should not be foreclosed from litigating their RICO claims. *See United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 362, 104 S.Ct. 1099, 1104, 79 L.Ed.2d 361 (1984) (difference in relative burdens of proof precludes application of collateral estoppel); *Standlee v. Rhay*, 557 F.2d 1303, 1305 (9th Cir.1977) (same).

The Supreme Court strongly suggests that the proper burden of proof of predicate acts in RICO litigation is by a preponderance of the evidence. *Sedima*, 105 S.Ct. at 3282–83 (no indication that Congress sought to depart from preponderance standard); *Armco Industrial Credit Corp. v. SLT Warehouse Co.*, 782 F.2d 475, 481 (5th Cir.1986) (noting that Supreme Court "strongly suggested" that preponderance standard applies). Post-*Sedima* appellate decisions hold that a plaintiff in a civil RICO action bears a "preponderance of the evidence" standard of proof. *E.g., Cullen v. Margiotta*, 811 F.2d 698, 731 (2d Cir. 1987); *United States v. Local 560, Int'l Bhd of Teamsters*, 780 F.2d 267, 279–80 n. 12 (3rd Cir.1985), *cert. denied*, — U.S. —, 106 S.Ct. 2247, 90 L.Ed.2d 693 (1986). We have found no civil RICO cases applying the clear and convincing standard of proof for predicate acts. Conversely, district courts have uniformly applied the preponderance standard. *See, e.g., Ford Motor Co. v. B & H Supply, Inc.*, 646 F.Supp. 975, 1001 (D.Minn.1986); *Bosteve, Ltd. v. Marauszwski*, 642 F.Supp. 197, 202 n. 7 (E.D.N.Y.1986); *Owl Constr. Co., Inc. v. Ronald Adams Contractor*, 642 F.Supp. 475, 477 (E.D.La.1986); *Platsis v. E.F. Hutton & Co.*, 642 F.Supp. 1277, 1309 (W.D.Mich.1986); *Stainton v. Tarantino*, 637 F.Supp. 1051, 1070 (E.D.Pa.1986); *see also Leavy v. Binder, Robinson*, (E.D.Pa. Sept. 18, 1986) (unpublished mem.) ("Third Circuit and the Supreme Court have concluded that the proper standard of proving predicate acts is by a preponderance of the evidence").

■ We conclude that the preponderance of evidence standard applies to proof of predicate acts in civil RICO litigation.

---

7. The elements of common law fraud are (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) an intent that it be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) reliance on its truth; (8) the right to rely thereon; and (9) consequent and proximate injury. *Rice v. McAlister*, 268 Or. 125, 128, 519 P.2d 1263, 1265 (1974). In comparison, the elements of a violation of section 1962(c) are (1) conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering activity. *Sedima*, 105 S.Ct. at 3285. A plaintiff has standing only if he or she can show an injury to business or property by the conduct constituting the violation. *Id.* at 3285–86. In addition, the plaintiff must also prove the elements of the predicate act. *See Durante Bros. & Sons v. Flushing Nat'l Bank*, 755 F.2d 239, 248 (2d Cir.), *cert. denied*, 473 U.S. 906, 105 S.Ct. 3530, 87 L.Ed.2d 654 (1985); *Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 17 (2d Cir.1983), *cert. denied*, 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984); *Von Bulow by Auersperg v. Von Bulow*, 634 F.Supp. 1284, 1304 (S.D.N.Y.1986).

Few cases, however, specifically compare the elements of a civil RICO claim with any common law cause of action. In *Travelers Indem. Co. v. Sarkisian*, 794 F.2d 754, 761 (2d Cir.), *cert. denied*, — U.S. —, 107 S.Ct. 277, 93 L.Ed.2d 253 (1986), the court, reviewing a dismissal on *res judicata* grounds, concluded that "the elements of the state law claims [fraudulent conveyances and unlawful payments of dividends and salary] are not virtually identical to those previously pled under RICO." (footnote omitted). *See also Malley-Duff & Assocs v. Crown Life Ins. Co.*, 792 F.2d 341, 347–48 (3rd Cir.) (civil RICO is "far removed" from any traditional state action for purposes of borrowing state statute of limitations), *cert. granted*, — U.S. —, 107 S.Ct. 569, 93 L.Ed.2d 573 (1986); *Durante Bros.*, 755 F.2d at 249 ("no state law analog to the present civil RICO claim"); *Ralston v. Capper*, 569 F.Supp. 1575, 1580 (E.D.Mich.1983) (RICO "fraud" claim is not identical to a state common law fraud claim). Similarly, in *Armco*, 782 F.2d at 482, the Fifth Circuit held that the elements necessary to support damages under civil RICO are different from state causes of action, including common law fraud. The difference is that "justifiable reliance is not an element that need be proven to establish a mail fraud violation." *Id.*

While there may be sound arguments that a greater burden of proof should apply, *see Haroco,* 747 F.2d at 402 ("the relevant considerations are numerous"), we do not depart from the Supreme Court's directive in *Sedima* and the many courts which have applied the preponderance standard. The borrowers' RICO claims are not collaterally estopped.

### CONCLUSION

The district court's entry of JNOV on the Sherman Act claims is *AFFIRMED.* The grant of summary judgment on the RICO claims is *REVERSED* and the matter is *REMANDED* for further proceedings.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED.

Each side is to bear its own costs of appeal.

BOOCHEVER, Circuit Judge, dissenting in part:

I would hold that the jury verdicts for the bank on the common law fraud claims collaterally estop prosecution of the RICO claims based on the predicate acts of mail fraud. Although the mail fraud statute is broader than common law fraud, I think that we must compare the specific allegations of both claims in order to determine whether collateral estoppel applies. If, to establish its RICO claims, Wilcox must prove the same elements required for common law fraud to the same degree of certainty, its RICO claims are estopped.

As the majority points out, the elements of common law fraud in Oregon are: "(1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; and (9) his consequent and proximate injury." *Rice v. McAlister,* 268 Or. 125, 128, 519 P.2d 1263, 1265 (1974).

The elements of the crime of mail fraud under 18 U.S.C. § 1341 (1982) are also clear: (1) a scheme to defraud, and (2) the use of the mails in furtherance of the scheme. *Pereira v. United States,* 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954). A scheme to defraud need not include a material misrepresentation or a failure to disclose. *See, e.g., United States v. Louderman,* 576 F.2d 1383, 1387 (9th Cir.), *cert. denied,* 439 U.S. 896, 99 S.Ct. 257, 58 L.Ed.2d 243 (1978) (misappropriation of confidential and nonpublic information can be a scheme to defraud). When the government seeks a criminal conviction under section 1341, it need not prove that anyone was defrauded or that anyone suffered a loss. *Farrell v. United States,* 321 F.2d 409, 419 (9th Cir.1963), *cert. denied,* 375 U.S. 992, 84 S.Ct. 631, 11 L.Ed.2d 478 (1964).

The jury in these consolidated cases rendered general verdicts that the defendants were not guilty of fraud under Oregon law. On the surface, the disparity between the elements constituting common law fraud and those constituting the crime of mail fraud appear to prevent the verdicts on common law fraud from having preclusive effect on the RICO claims. The civil action for fraud must be compared, however, to a civil action under RICO that is based on mail fraud. The RICO statute requires that the racketeering activities injure the plaintiff in his business or property. 18 U.S.C. § 1964(c). Therefore, even though the crime of mail fraud does not require reliance or injury, a civil RICO action alleging mail fraud as the predicate act would appear to include these elements.

For Wilcox to prevail on its claims of mail fraud under RICO it must show, in addition to a pattern of racketeering activity, that: (1) the bank made a representation as to the applicable prime rate; (2) the representation was false; (3) it was material; (4) the bank knew it was false; (5) the bank intended Wilcox to pay a higher interest rate and that such payment was reasonably contemplated; (6) Wilcox was ignorant of the falsity of the representation of the applicable prime rate; (7) Wilcox relied on its truth; (8) Wilcox had a right to rely on it; and (9) Wilcox suffered consequential

and proximate injuries. These are the same elements that it unsuccessfully attempted to prove for common law fraud. Wilcox would be estopped on its RICO claims, if we applied the same burden of proof to both causes of action, as it failed to prove at least one of the elements of common law fraud.

The Supreme Court in *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) expressed uncertainty as to whether predicate acts must be established by proof beyond a reasonable doubt, but did not decide the standard of proof issue. *Id.* 105 S.Ct. at 3282–83. After *Sedima,* the Third Circuit held that, in a civil action *brought by the government* under RICO, the predicate acts of extortion may be proved by a preponderance of the evidence. *United States v. Local 560, Int'l Bhd. of Teamsters,* 780 F.2d 267, 279 n. 12 (3d Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 2247, 90 L.Ed.2d 693 (1986). The Second Circuit, relying on the dicta in *Sedima,* stated that the plaintiffs would have to prove their RICO claims involving coercive solicitation of political contributions by a preponderance of evidence on remand. *Cullen v. Margiotta,* 811 F.2d 698, 731 (2d Cir.1987). The burden of proof was not at issue in the case. One of the significant issues was determining the appropriate statute of limitations for civil RICO claims. The Second Circuit borrowed New York's statute of limitation for the state cause of action that most closely resembled the predicate acts alleged and applied both state and federal tolling doctrines to that limitations period. *Id.* at 717–27. Similarly, we should borrow Oregon's standard of proof for the state cause of action most closely resembling the predicate acts. In this case, that cause of action is fraud.

RICO defines predicate acts as: (1) offenses chargeable under state law and punishable by imprisonment for more than one year; (2) offenses indictable under various sections of title 18 (federal crimes, including *mail fraud* ) or title 29 (labor law); (3) offenses involving *fraud under the bankruptcy code* (title 11) or in the *sale of securities* (title 15); (4) any felony under any law of the United States involving narcotics or dangerous drugs; and (5) any offense indictable under the Currency and Foreign Transaction Reporting Act. 18 U.S.C. § 1961(1) (Supp. III 1985). I believe that the following rules should apply for determining the burden of proof necessary to establish predicate acts in civil RICO actions. For those relatively few state and federal criminal statutes that contain an implied or explicit private right of action, such as the federal securities laws, the standard of proof under RICO should be the same as in the private action under the federal or state statute. Where there is no right to sue privately, courts should look to the most analogous common law action, usually a tort, for the appropriate burden of proof. In most cases this analysis will lead courts to require a preponderance of evidence to establish the predicate acts.[1] The most important exception is when a plaintiff alleges fraud as the predicate act.

Most states, but not all, require plaintiffs to establish fraud by clear and convincing evidence. *See* C. McCormick, *McCormick on Evidence* 959–61 (3d ed. 1984). Oregon applies this standard of proof. According to the Supreme Court, courts of equity created this burden of proof for a particular class of claims:

A higher standard of proof apparently arose in courts of equity when the chancellor faced claims that were unenforcea-

---

**1.** Private claimants alleging fraud in the sale of securities must establish their case by a preponderance of the evidence. *See Herman & MacLean v. Huddleston,* 459 U.S. 375, 387–91, 103 S.Ct. 683, 689–92, 74 L.Ed.2d 548 (1983). Creditors alleging that a debtor should not be granted a discharge because of fraud must prove the fraud by clear and convincing evidence in some courts, *see, e.g., In re Hames (Northern State Bank v. Hames),* 53 B.R. 868, 871 (D.Minn.1985); by a "fair preponderance" of the evidence in

some, *see, e.g., In re Carr (McReynolds v. Carr),* 49 B.R. 208, 210 (W.D.Ky.1985); and by a preponderance in others, *see, e.g., Farmers Co-op. Ass'n v. Strunk,* 671 F.2d 391, 395 (10th Cir. 1982). Other than in the context of RICO, federal appellate courts hold that there is no private right of action for mail fraud under 18 U.S.C. § 1341. *Ryan v. Ohio Edison Co.,* 611 F.2d 1170, 1177–79 (6th Cir.1979); *Bell v. Health-Mor, Inc.,* 549 F.2d 342 (5th Cir.1977).

ble at law because of the Statute of Wills, the Statute of Frauds, or the parol evidence rule. See Note, Appellate Review in the Federal Courts of Findings Requiring More than a Preponderance of the Evidence, 60 Harv.L.Rev. 111, 112 (1946). Concerned that claims would be fabricated, the chancery courts imposed a more demanding standard of proof. The higher standard subsequently received wide acceptance in equity proceedings to set aside presumptively valid written instruments on account of fraud. *Herman & MacLean v. Huddleston,* 459 U.S. 375, 388 n. 27, 103 S.Ct. 683, 690 n. 27, 74 L.Ed.2d 548 (1983) (case citations omitted); *see also* 37 Am.Jur.2d *Fraud and Deceit* §§ 468–69 (1968).

The Note cited by the Supreme Court in *Huddleston* states:

> The requirement in civil actions of more than a preponderance of the evidence was first applied in equity to claims which experience had shown to be inherently subject to fabrication, lapse of memory, or the flexibility of conscience. Conceding the validity of policies which the parol evidence rule and the Statutes of Wills and Frauds were designed to carry out, the chancery courts compromised between becoming a mecca for the trumped-up prayer for relief and refusing altogether to mitigate the stern fulfillment of these policies in the law courts, by granting relief only in cases where the evidence in support of this type of claim was "clear and convincing."

Note, 60 Harv.L.Rev. at 112 (footnotes omitted). Federal common law, in the days before *Erie,* required clear and convincing evidence of fraud. *See United States v. California Midway Oil Co.,* 259 F. 343, 352–53 (S.D.Cal.1919), *aff'd,* 279 F. 516 (9th Cir.1922), *aff'd,* 263 U.S. 682, 44 S.Ct. 136, 68 L.Ed. 504 (1923).

Requiring that RICO claims based on mail fraud be proved by clear and convincing evidence would further the policy of discouraging claims that are difficult and time-consuming to prove. Borrowing the standard of proof used in the analogous state-law cause of action would make plaintiffs who bring both state law claims of fraud and RICO claims based on mail fraud prove these claims by identical weights of evidence. Requiring different burdens of proof under these circumstances must be confusing to a jury. Here, if the burden of proof for the RICO claims is by a preponderance of the evidence, the bank is exposed to treble damages for the same acts that failed to establish liability at common law. It seems incongruous and unfair to impose greater liability on the basis of factual determinations that will be made with less certainty. Moreover, in almost any case of common law fraud where the mails are involved, plaintiffs, by bringing state and federal actions, can have two bites at the apple unless collateral estoppel is applied.

As Judge Kennedy pointed out in his concurring opinion in *Schreiber Distrib. Co. v. Serv-Well Furniture Co.,* 806 F.2d 1393 (9th Cir.1986), the combination of civil RICO and mail fraud may create the mecca for trumped-up claims feared by the equity courts:

> The potential range of criminal prosecution under the federal mail and wire fraud laws is vast, made so in part by expansive judicial interpretation. The reach of those statutes exists against a backdrop of prosecutorial discretion, however, discretion which, if sensitively exercised, operates as a check to the improvident exertion of federal power. No such check operates in the civil realm. A company eager to weaken an offending competitor obeys no constraints when it strikes with the sword of the Racketeer Influenced and Corrupt Organizations Act.

> It is most unlikely that Congress envisaged use of the RICO statute in a case such as the one before us, but we are required to follow where the words of the statute lead, *Sedima, S.P.R.L. v. Imrex Co.* [473 U.S. 479], 105 S.Ct. 3275 [87 L.Ed.2d 346] (1985).... Thus federal power inches forward when a statute is left unattended, whether from Congress' indifference or its acquiescence.

*Id.* at 1402 (Kennedy, J., concurring) (some citations omitted). In the absence of a Supreme Court holding explicitly to the contrary, I see no need to expand RICO claims based on mail fraud by allowing a lesser burden of proof than required for state law fraud. I would hold that Wilcox's RICO claims are collaterally estopped.