**Dr. Clarke BUMGARNER, Plaintiff,**

v.

**BLUE CROSS AND BLUE SHIELD OF KANSAS, INC., Defendant.**

**No. 86–4069.**

United States District Court, D. Kansas.

Jan. 28, 1988.

Certification For Interlocutory Appeal Denied Feb. 16, 1988.

Steven M. Dickson, Dickson & Pope, P.A., Topeka, Kan., for plaintiff.

B. Jane Chandler Holt, Staff Counsel, Blue Cross & Blue Shield of Kansas, Topeka, Kan., Alan L. Rupe and Lawrence M. Gurney, Kahrs, Nelson, Fanning, Hite & Kellogg, Wichita, Kan., and Alleen Castellani, Asst. U.S. Atty., Topeka, Kan., for defendant.

## MEMORANDUM AND ORDER

EARL E. O'CONNOR, Chief Judge.

This matter is before the court on the motion for summary judgment of defendant Blue Cross and Blue Shield of Kansas, Inc. (hereinafter "Blue Cross"). Plaintiff Clarke Bumgarner (hereinafter "Bumgarner") brought an action against Blue Cross, asserting claims based on the Racketeering Influenced and Corrupt Organizations Act (hereinafter "RICO"), fraud, breach of contract, negligence, tortious interference with contractual rights, tortious interference with business relationships, and defamation.

The pertinent facts are as follows: Bumgarner is a doctor of chiropractic medicine who is licensed to practice in Kansas. He currently lives and practices in Coffeyville, Kansas.

Blue Cross is a nonprofit medical and hospital service corporation which provides health insurance to Kansas residents. Its principal place of business is Topeka, Kansas. Blue Cross receives income from subscriber premiums and from interest earned on premium reserves. The income is used for operating expenses, claims payment, accumulation of reserves, and subscriber refunds. Blue Cross is extensively regulated by Kansas statutes; one requirement is that Blue Cross "devote a reasonable effort to control costs, including both its administrative costs and costs charged to it by participating hospitals and physicians." K.S.A. 40-19c10(c).

Beginning January 1, 1984, Blue Cross initiated the Competitive Allowance Program (hereinafter "CAP") in response to growing concern about the increasing costs of health care. CAP is a program whereby health care providers, including hospitals, physicians, and chiropractic doctors, may contract with Blue Cross to receive direct payment for covered services. The provider may thereby avoid the uncertain and often difficult process of collecting from the patient. Thus the incentives and benefits associated with CAP participation are high.

CAP provides reimbursement limits for participating health care providers. A distinctive feature of CAP is the Maximum Allowable Payments (hereinafter "MAPs") program, whereby predetermined maximum payments are made to providers rendering specified services. MAPs were developed based on the billing practices of hospitals and professional providers. They are adjusted each year to reflect a variety of factors, including inflation, changes in technology, or geographic influences. A CAP-participating provider is allowed its actual charges for covered services, but payment will not exceed the applicable MAP. Thus providers are encouraged to control costs, thereby benefitting Blue Cross, its subscribers, and Kansans in general.

Participation in CAP is widespread, with participants including hospitals (both nonprofit and for-profit), medical doctors, osteopaths, optometrists, podiatrists, certified registered nurse anesthetists, dentists, occupational therapists, psychologists, social workers, and chiropractors. The participation rates for all health care providers in 1984–1987 were 86.1 percent, 88.7 percent, 88.5 percent, and 89.0 percent.

Participants in CAP sign a "contracting provider agreement." Under the agreement, a provider agrees to submit to Blue Cross claims for covered services rendered to subscribing patients, and to look to Blue Cross for payment except for co-insurance, deductibles, and amounts exceeding the ap-

plicable MAP. The provider agrees not to bill Blue Cross in excess of the MAP.

Blue Cross periodically reviews claims submitted by health care providers under a process called "utilization review." Utilization review consists of various elements, including data analysis, prepayment review, and post-payment review. Consultants from various provider specialties, including chiropractors, assist Blue Cross in the review and give their professional opinion whether services provided are medically necessary and covered by the contracting provider agreement.

Prepayment review is conducted either in regard to the provider's entire practice or in regard to specific services. It requires that the provider submit records substantiating services because other utilization review has indicated a need to further investigate services or claims. Payment is made according to the dictates of the reviewed record.

Bumgarner has been a CAP participant since January 1, 1984. In October 1984, his utilization review statistics were analyzed, showing his utilization rate to be about two times the average rate. In the third quarter of 1984, Bumgarner ranked ninth among 366 chiropractors for occurrences per 100 patients; in the second quarter of 1984, he ranked third among 357 chiropractors. As a result of these statistics, Duane Miller (hereinafter "Miller"), a chiropractic consultant, reviewed the patient history and claims submissions for ten of Bumgarner's patients. Miller recommended that Bumgarner be placed on prepayment review, and the recommendation was approved on July 8, 1985. On September 19, 1985, a Blue Cross field representative visited Bumgarner's office, notified him of his placement on prepayment review, and explained the review process. This information was reiterated to Bumgarner in a December 17, 1985, letter.

Bumgarner continued to submit claims to Blue Cross following his placement on prepayment review. Most of these claims were reviewed by Miller, who denied some claims and allowed payment on others. From September 19, 1985, until January

1986, about 56 percent of Bumgarner's claims were denied. Bumgarner appealed some of these denials through Blue Cross' intraorganizational appeals process, and he eventually received payment on 62 percent of the amount appealed.

Bumgarner asserts that most or all of Blue Cross' denials of his claims were wrongful, and that they give rise to causes of action under RICO and Kansas common law. Blue Cross moves for summary judgment on the RICO claim, asserting that Bumgarner has failed to establish that Blue Cross (1) committed predicate acts, (2) engaged in a pattern of racketeering activities, (3) used racketeering funds to invest in, acquire, or maintain an enterprise, or (4) caused injury to Bumgarner by investing in, acquiring, or maintaining an enterprise. Blue Cross further asserts that because no federal issue exists, the court should decline to exercise pendent jurisdiction.

When considering a motion for summary judgment, we must examine all evidence in the light most favorable to the opposing party. *Prochaska v. Marcoux,* 632 F.2d 848, 850 (10th Cir.1980), *cert. denied,* 451 U.S. 984, 101 S.Ct. 2316, 68 L.Ed.2d 841 (1981). If the moving party bears the burden of proof at trial, he must show, through pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. *See* Fed.R. Civ.P. 56(c). If the moving party does not bear the burden of proof, he must show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265, 275 (1986). This burden is met when the moving party identifies those portions of the record demonstrating an absence of a genuine issue of material fact. *Id.,* 477 U.S. at 324, 106 S.Ct. at 2553, 91 L.Ed.2d at 274.

If the moving party meets his requirement, the burden shifts to the nonmoving party, who "must set forth *specific facts* showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91

L.Ed.2d 202, 212 (1986) (emphasis added). The trial judge then determines whether a trial is needed—"whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.*, 477 U.S. at 250, 106 S.Ct. at 2511, 91 L.Ed.2d at 213.

## I. *The RICO Claim.*

RICO was enacted to combat "racketeering activity," a broad range of acts including mail fraud, wire fraud, and fraud in transactions affecting interstate commerce. *See* 18 U.S.C. § 1961(1). RICO must be read broadly, *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985); Congress intended that RICO apply to "legitimate," respected enterprises as well as to "illegitimate" enterprises controlled by organized crime. *See id.* at 499, 105 S.Ct. at 3286.

RICO provides for criminal sanctions as well as civil liability. *See* 18 U.S.C. §§ 1963, 1964. Section 1964(c) affords a private cause of action to any person injured by a violation of section 1962. Section 1962 provides, in pertinent part:

(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ... to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce....

(b) It shall be unlawful for any person through a pattern of racketeering activity ... to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity....

*Id.* § 1962.

### A. *The Predicate Acts.*

Our initial inquiry is whether sufficient evidence indicates that Blue Cross committed predicate acts. Proof of two or more predicate acts is necessary to establish racketeering activity as required by RICO. 18 U.S.C. §§ 1961(1), 1961(5). Mail fraud, *see id.* § 1341, and wire fraud, *see id.* § 1343, are included in the list of predicate acts. *See id.* § 1961(1)(B). For Bumgarner to recover, he must prove that use of the mail or wire communications is an integral part of Blue Cross' scheme. *See United States v. Zang*, 703 F.2d 1186, 1193 (10th Cir.1982) (a criminal conviction under RICO requires proof that use of the mail is an integral part of the scheme).

Bumgarner must prove his RICO claim, including the predicate acts, by a preponderance of the evidence. *See Liquid Air Corp. v. Rogers*, 834 F.2d 1297 (7th Cir. 1987) (preponderance standard is proper in civil RICO actions); *Wilcox v. First Interstate Bank of Oregon*, 815 F.2d 522, 531 (9th Cir.1987); *Cullen v. Margiotta*, 811 F.2d 698, 731 (2d Cir.), *cert. denied*, 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987); *Armco Industrial Credit Corp. v. SLT Warehouse Co.*, 782 F.2d 475, 480–81 (5th Cir.1986); *United States v. Local 560, Int'l Bhd. of Teamsters*, 780 F.2d 267, 279–80 n. 12 (3d Cir.1985), *cert. denied*, 476 U.S. 1140, 106 S.Ct. 2247, 90 L.Ed.2d 693 (1986); *see also Herman & MacLean v. Huddleston*, 459 U.S. 375, 390, 103 S.Ct. 683, 691, 74 L.Ed.2d 548 (1983) (applying the preponderance standard to a civil securities action based on fraud). In considering this summary judgment motion, we must remain mindful of this standard. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202, 214 (1986). Further, in assessing whether the evidence is sufficient to support Bumgarner's allegations of fraud, we must consider both direct and circumstantial evidence, including reasonable inferences that can be drawn, in the light most favorable to Bumgarner.

*United States v. Washita Constr. Co.,* 789 F.2d 809, 815 (10th Cir.1986).

■ Bumgarner asserts that Blue Cross engaged in schemes of fraud (1) to induce him to participate in CAP, and (2) during his participation in CAP. He initially alleges that Blue Cross made fraudulent misrepresentations designed to gain his participation in CAP. Although he asserts that the misrepresentations were sent by mail, he presents no specific facts regarding the mailings, such as their date or content. These conclusory allegations do not suffice to preclude summary judgment against Bumgarner on this issue. *See id.,* 477 U.S. at 248, 106 S.Ct. at 2510, 91 L.Ed.2d at 212 (1986) (Bumgarner "must set forth specific facts showing that there is a genuine issue for trial.").

■ Bumgarner further asserts that Blue Cross fraudulently denied him reimbursement during his participation in CAP. The gist of this contention is that the contracting provider agreement, the contract he signed with Blue Cross, contains misrepresentations by Blue Cross. He argues that the agreement misrepresents that Blue Cross will, in good faith, pay claims which participating providers present, whereas in fact Blue Cross arbitrarily and fraudulently has denied valid claims by use of the mail and wire communications. Bumgarner has produced sufficient evidence indicating a contract whereby Blue Cross made certain representations. The agreement, signed by G. Wayne Johnston, the president of Blue Cross, is on file with the court. However, whether Blue Cross has fraudulently failed to fulfill its obligations under the agreement remains at issue.

At first glance, Bumgarner's assertion that the claims denials are fraudulent appears to be based largely on the simple fact that the claims were denied. He presents no direct evidence of fraudulent intent on the part of Blue Cross. Blue Cross thus argues that the denials merely indicate a contractual disagreement between the parties as to the propriety of certain chiropractic services. However, closer examination of the record reveals evidence on which a fact-finder could infer fraud.

First, a large proportion of Bumgarner's claims, 56 percent, were denied. Although he has appealed some of the denials and succeeded in 62 percent of his appeals, he received favorable appellate decisions only after initiating this action. Second, evidence indicates that Blue Cross invariably delays determining whether Bumgarner's claims are compensable under the standards of the CAP, MAP, and prepayment review programs. The delays are allegedly arbitrary and unwarranted: Blue Cross often requests duplicative information or fails to recognize its own coding and reporting procedures. It denies some claims for insufficient documentation, while ruling, either favorably or unfavorably, on identical claims with identical documentation. The end result is that Blue Cross benefits by avoiding payment entirely or by delaying payment. Third, the record indicates that at least ten other chiropractors have experienced difficulties similar to Bumgarner's. Drs. Alan Bonebrake, Mark Neuman, M.D. Niedens, M.E. Niedens, R.E. Walker, Harry Sanborn, George Watson, Jim Bailey, Douglas Boehr, and F.W. Johnson have experienced a high percentage of unwarranted denials and delays in the course of their dealings with Blue Cross. Fourth, the record indicates that Blue Cross pays chiropractors only 80 percent of the amount it pays other health care providers for procedures such as ultrasound treatments, in spite of the fact that Blue Cross represented that it would not discriminate among health care providers in its reimbursement policies.

In sum, although Bumgarner has come perilously close to not clearing the evidentiary hurdle set down by the Supreme Court in *Anderson,* we find sufficient facts to present an issue for trial; more than a scintilla of evidence supports a finding of fraud. Were Bumgarner the only chiropractor to experience difficulty in dealing with Blue Cross, simple inattentiveness or inefficiency might explain the situation; however, multiple chiropractors experience similar difficulties. Thus, the actions of Blue Cross may indicate more than a mere

contractual dispute or a disagreement as to the necessity of medical treatment; they may indicate an arbitrary and capricious intent to deny chiropractors in general, and Bumgarner in particular, rightful reimbursement of claims. Further, misrepresentation may be involved because of Blue Cross' promise to evaluate claims in a fair and nondiscriminatory manner. Finally, Blue Cross' allegedly fraudulent denials utilize the mail and wire communications. Thus summary judgment for failure to evince predicate acts is unwarranted.

However, as indicated above, the court has serious reservations regarding this issue. Our ruling reflects our unwillingness to dismiss the action based on the record to date. Following presentation of the plaintiff's case, the court will undoubtedly be in a much better position to judge the adequacy of the prima facie showing of fraud.

### B. *The Pattern Requirement.*

■ We next address whether Blue Cross' alleged acts constitute a pattern of racketeering activity. Bumgarner asserts, and Blue Cross denies, that the acts, including perpetrating a fraud affecting interstate commerce through the use of the mail and wire communications, amount to a pattern of racketeering activity as defined by 18 U.S.C. § 1961(5). This section provides that a pattern requires at least two acts within ten years. The Supreme Court expounded on the pattern requirement in *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985):

> The implication is that while two acts are necessary, they may not be sufficient. Indeed, in common parlance two of anything do not generally form a "pattern." The legislative history supports the view that two isolated acts of racketeering activity do not constitute a pattern. As the Senate Report explained: "The target of [RICO] is thus not sporadic activity. The infiltration of legitimate business normally requires more than one 'racketeering activity' and the threat of continuing activity to be effective. It is this factor of *continuity plus relationship* which combines to produce a pat-

> tern." S.Rep. No. 91–617, p. 158 (1969) (emphasis added).

*Id.* at 496 n. 14, 105 S.Ct. at 3285 n. 14.

In *Torwest DBC, Inc. v. Dick*, the Tenth Circuit held that a pattern requires continuous and related acts. 810 F.2d 925, 928 (10th Cir.1987). "A scheme to achieve a single discrete objective does not in and of itself create a threat of ongoing activity, even when that goal is pursued by multiple illegal acts, because the scheme ends when the purpose is accomplished." *Id.* at 929. Rather than formulate a brightline test, the *Torwest* court endorsed a case-by-case approach to determine whether a pattern exists. *Id.* Given the facts that the case involved a single scheme with a single victim and a specific, rather than open-ended goal, the court found no pattern. *Id.* The Tenth Circuit reached the same result in the two "pattern" cases it decided following *Torwest*, both times finding that the alleged scheme had a single, discrete objective. *See Garbade v. Great Divide Mining & Milling Corp.*, 831 F.2d 212, 213–14 (10th Cir.1987); *Condict v. Condict*, 826 F.2d 923, 928–29 (10th Cir.1987).

The Tenth Circuit has not ruled on the issue of whether a pattern is presented by a scheme with no single objective which is directed toward one victim. *See Torwest*, 810 F.2d at 929 (declining to address the issue in a case involving a single objective). However, this court addressed the issue in *Smith v. MCI Telecommunications Corp.*, 678 F.Supp. 823 (D.Kan.1987). *Smith* involved a scheme whereby MCI allegedly cheated the plaintiff and other salespersons of commissions. We adopted the approach of the Seventh Circuit as stated in *Morgan v. Bank of Waukegan*, 804 F.2d 970 (7th Cir.1986). There, the court steered a middle course, stating that "the predicate acts must be ongoing over an identified period of time so that they can fairly be viewed as constituting separate transactions, *i.e.*, transactions somewhat separated in time and place." *Id.* at 975 (quotations omitted). The *Morgan* court continued:

> Relevant factors include the number and variety of predicate acts and the length of time over which they were committed,

the number of victims, the presence of separate schemes and the occurrence of distinct injuries. *However, the mere fact that the predicate acts relate to the same overall scheme or involve the same victim does not mean that the acts automatically fail to satisfy the pattern requirement.* The doctrinal requirement of a pattern of racketeering activity is a standard, not a rule, and as such its determination depends on the facts and circumstances of the particular case, with no one factor being necessarily determinative.

*Id.* at 975–76 (emphasis added). Applying the *Morgan* approach in *Smith,* we found sufficient allegations of a pattern, reasoning that "[a]lthough MCI's acts relate only to a single scheme to deprive Smith of her commissions, the acts were themselves separate occurrences, and the scheme, which would continue as long as Smith was employed, was open-ended." *Smith,* 678 F.Supp. 823, 827.[1]

■ Applying these standards in the instant case, we find sufficient allegation of a pattern. Bumgarner asserts that Blue Cross is defrauding him through denials of claims. Each claims denial is a distinct occurrence, and the scheme, which may continue as long as Bumgarner participates in CAP, is ongoing. Further, Bumgarner has submitted evidence regarding an action filed against Blue Cross by another chiropractor. The evidence indicates that other chiropractors have encountered difficulty when submitting claims to Blue Cross. Thus multiple schemes or a single scheme with multiple victims may be involved. However, we find that even if a single scheme is directed only toward Bumgarner, the scheme is continuous and thus indicates a RICO pattern.

---

1. Other courts in this district have recently embraced the principle that a single scheme involving a single victim may constitute a pattern where the scheme is open-ended and has no single goal. *See, e.g., Wichita Federal Savings & Loan Association v. Land Mark Group, Inc.,* 674 F.Supp. 321 (D.Kan.1987) (where Judge Kelly held that an open-ended scheme involving one victim is sufficient to survive a motion to dismiss for failure to state a claim); *O'Connor v.*

## C. *The Enterprise Issue.*

Bumgarner's complaint does not specify the subsections of section 1962 upon which it is based. In his responses to interrogatories, Bumgarner stated that he sought relief under subsections (a) and (b). His memorandum in response to Blue Cross' summary judgment motion largely focuses on these subsections, but also briefly discusses subsection (c). Thus before focusing on subsections (a) and (b), we will briefly discuss subsection (c).

■ Courts generally hold that under section 1962(c), which provides that it is "unlawful for any person employed by or associated with any enterprise engaged in ... interstate or foreign commerce to conduct ... such enterprise's affairs through a pattern of racketeering activity ...," 18 U.S.C. § 1962(c), the person and the enterprise must be distinct. *See, e.g., Bishop v. Corbitt Marine Ways, Inc.,* 802 F.2d 122, 123 (5th Cir.1986); *Schofield v. First Commodity Corp.,* 793 F.2d 28, 29–30 (1st Cir. 1986); *United States v. Benny,* 786 F.2d 1410, 1415–16 (9th Cir.1986), *cert. denied,* 479 U.S. 1017, 107 S.Ct. 668, 93 L.Ed.2d 720 (1986); *Bennett v. United States Trust Co.,* 770 F.2d 308, 315 (2d Cir.1985), *cert. denied,* 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986). *But see United States v. Hartley,* 678 F.2d 961, 988 (11th Cir. 1982), *cert. denied,* 459 U.S. 1170, 103 S.Ct. 815, 74 L.Ed.2d 1014 (1983). We agree.

In the instant case, Blue Cross is a person as defined by section 1961(3), and it is an enterprise as defined by section 1961(4). However, Bumgarner contends that this case involves a different enterprise, comprised of Blue Cross and its officers and agents. He therefore concludes that an enterprise distinct from the person, Blue Cross, is involved. We disagree. Blue

---

*Midwest Pipe Fabricators, Inc.,* 660 F.Supp. 696, 698 (D.Kan.1987) (where Judge Saffels held that a pattern is likely evinced by a single scheme involving a single victim where the scheme is open-ended and has no discrete goal). *But see Boyer v. Cline,* No. 85–1562, 1987 WL 54381 (D.Kan., *unpublished,* July 22, 1987) (where Judge Crow held that a single scheme with a single victim does not indicate a pattern, even though the scheme is open-ended).

Cross cannot act except through its officers, agents, and employees. Any association comprised of Blue Cross and its agents and officers acting in their employment capacity is, in fact, Blue Cross itself. Thus no distinct enterprise and person are involved, and summary judgment is warranted as to any claim under section 1962(c).

■ We next address whether under sections 1962(a) and 1962(b) the person and the enterprise may be the same entity. The language of these subsections differs from that of subsection (c): (a) and (b) proscribe certain actions by "any person," whereas (c) proscribes certain actions by "any person employed by or associated with any enterprise." Further, the proscriptions of subsections (a) and (b) are similar: (a) prohibits the use or investment of racketeering funds to acquire an interest in or establish an enterprise, and (b) prohibits racketeering activity directed toward acquiring an interest in or controlling an enterprise. *See Liquid Air Corp. v. Rogers,* 834 F.2d 1297 (7th Cir.1987). Thus the issue of whether the person and enterprise must be distinct should be similarly resolved under subsections (a) and (b). *See id.* (holding that the person and enterprise need not be distinct under subsections (a) and (b)); *Wilcox v. First Interstate Bank of Oregon,* 815 F.2d 522, 529 (9th Cir.1987) (same); *Klapper v. Commonwealth Realty Trust,* 657 F.Supp. 948, 956–57 (D.Del. 1987) (same).

This court has recently considered the issue of whether the person and enterprise must be distinct under subsection (a). *See Smith v. MCI Telecommunications Corp.,* 678 F.Supp. 823 (D.Kan.1987). Because the same result should be reached under subsection (b), we here adopt the analysis and language of *Smith:*

> [T]he language of section 1962(a) differs from that of section 1962(c), and courts have split over whether the person and the enterprise must be distinct under subsection (a). *Compare Schreiber Distributing Co. v. Serv-Well Furniture Co.,* 806 F.2d 1393, 1398 (9th Cir. 1986) (corporate defendant can also be enterprise under section 1962(a)) *and*

*Morgan,* 804 F.2d at 977 (same) *and Schofield,* 793 F.2d at 31 (same in dicta) *and Masi v. Ford City Bank & Trust Co.,* 779 F.2d 397, 401 (7th Cir.1985) (same) *and B.F. Hirsch, Inc. v. Enright Refining Co.,* 617 F.Supp. 49, 51–52 (D.N.J.1985) (same) *with United States v. Computer Sciences Corp.,* 689 F.2d 1181, 1190–91 (4th Cir.1982) (corporate defendant cannot also be enterprise under section 1962(a)), *cert. denied,* 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983) *and H.J., Inc. v. Northwestern Bell Tel. Co.,* 648 F.Supp. 419, 426–28 (D.Minn.1986) (same) *and Rush v. Oppenheimer & Co.,* 628 F.Supp. 1188, 1196–98 (S.D.N.Y.1985) (same) *and Cashco Oil Co. v. Moses,* 605 F.Supp. 70, 71 (N.D.Ill.1985). The Tenth Circuit has not addressed the issue.

We are persuaded that the better approach is to not require that the defendant/person be distinct from the enterprise. Such an approach comports with the language of subsection (a) and the definitions of section 1961. Section 1961 defines a person to include a corporate defendant such as MCI, and it defines an enterprise to include a corporation. *See* 18 U.S.C. § 1961(3), (4). Section 1962(a) makes it unlawful for any person, here MCI, to use racketeering income in the operation of any enterprise engaged in interstate commerce, again, here MCI. The language does not dictate that the entity generating racketeering income and the entity using the income in its operations be distinct. *See Schreiber Distributing,* 806 F.2d at 1397–98; *Masi,* 779 F.2d at 401–02. Additionally, this approach furthers the purposes underlying RICO. RICO was designed to attack systematic, corrupt influences on enterprises engaging in interstate commerce. Congress intended to reach both "legitimate," respected enterprises and "illegitimate" enterprises controlled by organized crime. *See Sedima,* 473 U.S. at 499 [105 S.Ct. at 3286]. Given Congress' intent to reach "legitimate," respected enterprises engaged in a pattern of fraud, logic dictates that it intended to reach both those enterprises investing

funds procured by fraud in other enterprises and those enterprises furthering their own operations with illgotten gains. Little sense can be made of a distinction which would punish a corporation tainting interstate commerce by investing fraudulent gains in another enterprise, while allowing the same corporation to taint interstate commerce by using fraudulent gains in its own operations. Thus we conclude that under section 1962(a), the person and the enterprise need not be distinct.

*Smith,* 678 F.Supp. at 827–28. Thus for Bumgarner to recover under section 1962(a) and section 1962(b), he need not prove a person and enterprise which are distinct. He has produced sufficient evidence that a person, Blue Cross, committed racketeering acts, and the acts or proceeds from the acts benefitted Blue Cross; thus an enterprise was affected. Summary judgment is therefore unwarranted on Blue Cross' contention that the record suggests no investment by or racketeering acts of Blue Cross to acquire or maintain control of an enterprise.

■ Additionally, Blue Cross' argues that the alleged racketeering activity, denial of claims, generated no income and thus is not actionable under subsection (a). This argument is meritless. Fraudulent nonpayment of obligations provides capital which would otherwise be unavailable. The use of this ill-gotten capital in an enterprise is as destructive to interstate commerce as is the use of actual income generated by fraud. Given the Supreme Court's mandate to broadly construe RICO, summary judgment is unwarranted based on the assertion that no actual income was generated from the alleged racketeering acts.

### D. *The Causation Issue.*

■ Blue Cross asserts that any injury Bumgarner received resulted only from the predicate acts. Thus, it argues, Bumgarner may not recover under subsections (a) and (b) because he has not been injured by Blue Cross' gaining or maintaining control of an enterprise.

In *Sedima, S.P.R.L. v. Imrex Co.,* the Supreme Court held that a "racketeering injury" apart from the predicate acts is not required to recover under section 1964(c), which allows a private action by a person injured by a violation of section 1962. *Sedima,* 473 U.S. at 495, 105 S.Ct. at 3284. The Court explained that section 1962 prohibits using money acquired from a pattern of racketeering activity to invest in an enterprise, 18 U.S.C. § 1962(a), to acquire control of an enterprise through a pattern of racketeering activity, *id.* § 1962(b), or to conduct an enterprise through a pattern of racketeering activity. *Id.* § 1962(c). The Court stated:

> If the defendant engages in a pattern of racketeering activity in a manner forbidden by these provisions, and the racketeering activities injure the plaintiff in his business or property, the plaintiff has a claim under § 1964(c). There is no room in the statutory language for an additional, amorphous "racketeering injury" requirement.

*Sedima,* 473 U.S. at 495, 105 S.Ct. at 3284. The Court then focused on subsection (c), holding that "the compensable injury is the harm caused by the predicate acts ..., for the essence of the violation is the commission of those acts in connection with the conduct of an enterprise." *Id.* at 497, 105 S.Ct. at 3285.

A violation of subsection (a) or (b) involves more than the mere commission of the predicate acts. Under subsection (a), after the acts, the money obtained must be invested in or used in the operation of an enterprise affecting interstate commerce. 18 U.S.C. § 1962(a). Under subsection (b), the acts themselves must result in acquiring or maintaining an interest in or control of an enterprise affecting interstate commerce. These further requirements have troubled courts addressing whether persons injured only by the predicate acts, not the use of the resulting funds or the control acquired through the acts, may recover under subsections (a) and (b).

Initially, we focus on subsection (a). Again, we adopt the language and reason-

ing of *Smith v. MCI Telecommunications Corp.*:

Some courts have held that the evident language differences in subsections (a) and (c) require different treatment of plaintiffs under the subsections. Typically, these courts hold that although a plaintiff may have suffered injury as a result of fraudulent acts, subsection (a) allows recovery only if the injury results from the use of the funds obtained by fraud. Thus a plaintiff injured only by the predicate acts cannot recover. *See, e.g., In re Gas Reclamation, Inc. Securities Litigation*, 659 F.Supp. 493, 511 (S.D.N.Y.1987); *Cincinnati Gas & Elec. Co. v. General Elec. Co.*, 656 F.Supp. 49, 83–84 (S.D.Ohio 1986); *Gilbert v. Prudential–Bache Securities, Inc.*, 643 F.Supp. 107, 109–10 (E.D.Pa.1986).

Other courts have held that injury resulting from the predicate acts suffices for recovery under subsection (a). *See, e.g., Haroco, Inc. v. American Nat'l Bank & Trust Co.*, 647 F.Supp. 1026, 1033 (N.D.Ill.1986); *Louisiana Power & Light v. United Gas Pipe Line*, 642 F.Supp. 781 (E.D.La.1986). We agree with these courts for the following reasons: First, the Supreme Court's language in *Sedima* strongly suggests that the Court would allow those injured by predicate acts to recover under section 1962(a). Although the case involved a subsection (c) claim, the Court stated that "[i]f the defendant engages in a pattern of racketeering activity in a manner forbidden by these provisions [ (section 1962(a)–(c)) ], and *the racketeering acts* injure the plaintiff in his business or property, the plaintiff has a claim under § 1964(c)." *Sedima*, 473 U.S. at 495, 105 S.Ct. at 3284 (emphasis added). Here, MCI allegedly engaged in a pattern of racketeering activities as prohibited by subsection (a), and Smith was allegedly injured as a result of these activities. Thus she should recover under section 1964(c).

Second, allowing recovery by Smith for alleged injuries resulting from the predicate acts conforms with the policy that RICO should be broadly interpreted.

*See* Pub.L. 91–452, § 904(a), 84 Stat. 947, *cited in Sedima*, 473 U.S. at 498, 105 S.Ct. at 3286 (RICO should "be liberally construed to effectuate its remedial purposes").

Third, this approach effectively extends RICO to corporate defendants. Congress intended that RICO cover corporations engaged in racketeering activities. *See Sedima*, 473 U.S. at 499 [105 S.Ct. at 3286] (citing *United States v. Turkette*, 452 U.S. 576, 586–87 [101 S.Ct. 2524, 2530–31, 69 L.Ed.2d 246] (1981)). Given the weight of authority that under subsection (c), the defendant and the enterprise must be distinct, a RICO plaintiff seeking recovery against a corporate defendant must rely on subsections (a) and (b). However, if the plaintiff must be injured by the use of racketeering proceeds, rather than the underlying racketeering acts, only the competitors of the corporate defendant are likely to have standing. These competitors will, in most instances, be entirely unaware of the predicate acts. *See King v. E.F. Hutton & Co., RICO Business Disputes Guide (CCH)* ¶ 6578 (D.D.C.1987). Thus the racketeering corporation will fail to feel the sting of the civil treble damage action which Congress contemplated. Allowing subsection (a) actions by persons injured by the predicate acts remedies this situation.

Fourth, the language of section 1962 and 1964(c) does not dictate that the plaintiff's injury be caused by the use of the racketeering proceeds. Section 1964(c) allows a person injured by a section 1962 violation to recover damages. When a corporation affecting interstate commerce commits racketeering acts and uses the proceeds in its operations, it has violated section 1962(a). A plaintiff injured by the predicate acts is injured as a result of the violation in spite of the fact that one element of the violation, the use of the proceeds, did not contribute to or cause his injury. *See Marshall & Ilsley Trust Co. v. Pate*, 819 F.2d 806, 809 (7th Cir.1987) (a plaintiff may recover under section 1964(c) by proving a violation of

section 1962 and "an injury directly resulting from some or all of the activities comprising the violation;" the plaintiff need not prove that every act involved in a RICO pattern caused him a direct injury); *Haroco v. American Nat'l Bank & Trust Co.*, 747 F.2d 384, 396–98 (7th Cir. 1984) (a plaintiff may recover under section 1964(c) by proving a violation of section 1962 and an injury resulting from the underlying racketeering acts; in a section 1962(c) action, the plaintiff need not prove that he was injured by the defendant's participation in the enterprise), *aff'd*, 473 U.S. 606 [105 S.Ct. 3291, 87 L.Ed.2d 437] (1985).

*Smith*, 678 F.Supp. at 828–29.

Research revealed no cases specifically addressing the issue of whether a plaintiff injured only by the predicate acts may recover under section 1962(b). However, given the similarities between the language of subsections (a) and (b), and given this court's parallel treatment of the subsections, we hold that *Smith's* language and reasoning is applicable to subsection (b). *See Wilcox v. First Interstate Bank of Oregon, N.A.*, 815 F.2d 522, 529 (9th Cir. 1987) (a plaintiff injured only by the predicate acts may recover under sections 1962(a) and 1962(b)). Thus summary judgment is not warranted based on Blue Cross' assertion that Bumgarner was injured only by the predicate acts.

In summary, Bumgarner has produced sufficient evidence to raise an issue of fact as to whether fraud was involved. He has sufficiently established a pattern, an affected enterprise, and causation. Thus summary judgment on his RICO claims under sections 1962(a) and 1962(b) is unwarranted.

## II. *The State Law Claims.*

■ Blue Cross urges the court to decline to exercise pendent jurisdiction over Bumgarner's state law claims. However, because summary judgment on the RICO claim is unwarranted, and because all of the claims arise from a common nucleus of operative facts and are such that they could reasonably be litigated in one proceeding, we choose to assert subject matter jurisdiction over the pendent state law claims. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966).

IT IS THEREFORE ORDERED that Blue Cross' motion is denied, except as it pertains to fraudulent mailings to induce Bumgarner's participation in CAP and to a RICO cause of action under 18 U.S.C. § 1962(c).

### ON MOTION FOR CERTIFICATION FOR INTERLOCUTORY APPEAL

This matter is before the court on the motion of defendant Blue Cross and Blue Shield of Kansas, Inc. (hereinafter "Blue Cross") for certification of the court's January 28, 1988 Memorandum and Order for interlocutory appeal pursuant to 28 U.S.C. 1292(b), and stay of the trial of this action scheduled for February 22, 1988. Blue Cross' motion is properly treated as a motion for an amendment of a judgement under Federal Rule of Civil Procedure 59.

Title 28, United States Code, Section 1292(b) provides as follows:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order.

■ Under section 1292(b), three criteria must be met for proper certification for interlocutory appeal. The order must involve (1) a controlling question of law, (2) a substantial ground for difference of opinion as to that question, and (3) a possible material advancement of the ultimate termination of the litigation. *Kirchen v. Guarantee National Ins. Co.*, 422 F.Supp. 58, 60–61 (E.D.Wis.1976).

Blue Cross' motion is based on the court's ruling regarding the "pattern" ele-

ment of a claim under the Racketeering Influenced and Corrupt Organizations Act ("RICO"). The court held that a single scheme directed only toward one victim constitutes a pattern under RICO if the scheme is open-ended and has no single goal. We determined that, given this standard, plaintiff Clarke Bumgarner had produced sufficient evidence to avoid summary judgment on his RICO claim. Blue Cross asserts that our ruling as to the RICO pattern requirement warrants interlocutory appeal. We disagree, finding no substantial ground for difference of opinion as to the pattern requirement.

As our earlier order recognized, courts within this district have diverged regarding the pattern element. *See Smith v. MCI Telecommunications Corp.,* 678 F.Supp. 823 (D.Kan.1987) (where this court held that a single scheme involving one victim constituted a pattern where the scheme was open-ended); *Wichita Federal Savings & Loan Association v. Land Mark Group, Inc.,* 674 F.Supp. 321 (D.Kan.1987) (where Judge Kelly held that an open-ended scheme involving one victim is sufficient to survive a motion to dismiss for failure to state a claim); *O'Connor v. Midwest Pipe Fabricators, Inc.,* 660 F.Supp. 696, 698 (D.Kan.1987) (where Judge Saffels held that a pattern is likely evinced by a single scheme involving a single victim where the scheme is open-ended and has no discrete goal). *But see Boyer v. Cline,* No. 85–1562 (D.Kan., *unpublished,* July 22, 1987) (where Judge Crow held that a single scheme with a single victim does not indicate a pattern, even though the scheme is open-ended). However, we are confident that this issue is not appropriate for interlocutory appeal. A review of the cases from this district reveals a distinct trend toward recognizing a single, ongoing scheme as a pattern. *See Wichita Federal Savings,* 674 F.Supp. 321 (where Judge Kelly abandoned his earlier pattern position espoused in *Agristor Leasing v. Meuli,* 634 F.Supp. 1208 (D.Kan.1986), which required multiple schemes); *O'Connor,* 660 F.Supp. at 698 (where Judge Saffels rejected his earlier decisions which required mul-

tiple schemes). Further, in *Torwest DBC, Inc. v. Dick,* 810 F.2d 925, 929 (10th Cir. 1987), the Tenth Circuit appears to approve of decisions of other circuits that allow a RICO claim to proceed given evidence of a single scheme involving one victim and continuous fraudulent activity. *Accord O'Connor,* 660 F.Supp. at 698. In sum, we find no substantial disagreement as to our ruling on the pattern requirement of RICO.

IT IS THEREFORE ORDERED that defendant Blue Cross' motion for amendment of the court's January 28, 1988 Memorandum and Order to allow for interlocutory appeal is denied.